ALL Counsel P.C.
By: Andrew L. Lee (AL-3765)
405 Lexington Ave. Fl. 26
New York, NY 10174
(212) 541-2429
alee@ALL-Counsel.com
*Counsel for Plaintiff Patrick J. Callahan, Jr.*

JUDGE JONES

10 CV 4599

RECEIVED JUN 11 2010 U.S.D.C. S.D.N.Y. CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICK J. CALLAHAN, JR.

         Plaintiff,

v.

CREDIT SUISSE (USA), INC., CREDIT SUISSE
GROUP SA, CREDIT SUISSE SECURITIES
(USA) LLC, and CREDIT SUISSE FIRST
BOSTON CORPORATION,

         Defendants.

**COMPLAINT**

Civ. No.: 10CV4599(BSJ)(JLC)
ECF CASE

*Trial by Jury Demanded*

  Plaintiff Patrick J. Callahan, Jr. ("**Callahan**"), by and through his counsel of record, Andrew L. Lee of ALL Counsel P.C., alleges, as and for his Complaint against Defendants Credit Suisse (USA), Inc., Credit Suisse Group SA, Credit Suisse Securities (USA) LLC, and Credit Suisse First Boston Corporation, as follows:

## INTRODUCTION

  1.  Plaintiff Callahan brings this action against his former employer and related entities, Credit Suisse (USA), Inc., Credit Suisse Group SA, Credit Suisse Securities (USA) LLC, and Credit Suisse First Boston Corporation, for breach of contract and breach of the duty of good faith and fair dealing. In 2000, after Credit Suisse acquired Donaldson, Lufkin & Jenrette (Callahan's then-current employer), it retained Callahan as a managing director, offered him a salary and bonus commensurate with his role in the combined organization and issued to

1

him a "Retention Award" consisting of $500,000 of Credit Suisse Group stock. Less than a year later, however, Credit Suisse terminated Callahan's employment without cause.

2. Rather than pay Callahan what the terms of his employment entitled him to, Credit Suisse, under the guise of good faith negotiation, embarked on a campaign to disenfranchise Callahan through bad faith conduct and delay. First, Credit Suisse made Callahan pursue his claim through its three-stage corporate dispute resolution program. Callahan obliged, in good faith. The result was Credit Suisse's written, signed, and expressly "binding" agreement to provide a specified separation package to Callahan, which included a $735,000 lump sum payment and Credit Suisse's confirmation of the balance of Callahan's previously vested $500,000 Retention Award. Callahan accepted that resolution (again, acting in good faith). Then, Credit Suisse's legal department sought to impose various releases and waivers of Callahan's rights, but each varied the prior package to which Credit Suisse had agreed in writing. Nonetheless, Callahan cooperated in Credit Suisse's process and sought to negotiate those agreements in good faith. Months passed with more of the same; then years.

3. Eventually, Callahan succumbed to Credit Suisse's dilatory tactics and, in a good faith effort to obtain closure, accepted and signed a package that included less than everything that Credit Suisse had promised in its prior written agreement. After that, however, Credit Suisse once again changed the deal by claiming Callahan had rejected the already-reduced package, and reduced it further by purporting to take away the remainder of Callahan's fully vested $500,000 Retention Award.

4. By that time, it finally became clear that Credit Suisse's secret intent all along was to present Callahan with the illusory prospect of getting paid while in reality using delay and bad faith negotiation to force him into submission on point after point. This time, rather than

bow to Credit Suisse's strong-arming, Callahan resolved to enforce his rights through this action. Credit Suisse agreed to pay Callahan $735,000 in separation pay and the remaining two-thirds of his Retention Award. To date, they have paid him nothing. This action seeks to recover those amounts (now worth more than $1.1 million, conservatively) for breach of the two separate agreements in which Credit Suisse agreed to these payments, as well as for Credit Suisse's bad faith and unfair treatment of Callahan at all relevant times.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C.A. § 1332(a).

6. Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(a) because the Defendants reside in this District and because a substantial part of the events and/or omissions upon which Plaintiff's claims are based occurred within this District.

## PARTIES

7. Plaintiff Callahan is an individual residing in Cook County, Illinois. Callahan formerly was an employee of one or all of the Defendants.

8. Upon information and belief, Defendant Credit Suisse (USA), Inc. ("**Credit Suisse Inc.**") is a Delaware corporation in the financial services industry with its principal place of business in New York, NY. Credit Suisse Inc. is a subsidiary of Defendant Credit Suisse Group. Prior corporate names of Credit Suisse Inc. have included Credit Suisse First Boston (USA), Inc. and Donaldson, Lufkin & Jenrette, Inc.

9. Upon information and belief, Defendant Credit Suisse Group SA ("**Credit Suisse Group**") is a Swiss Corporation in the financial services industry with its principal place of

business in Switzerland and with regional headquarters in New York, NY. Credit Suisse Group is a publicly traded company that regularly conducts substantial business activities within New York State. Credit Suisse Group is the parent company of Defendants Credit Suisse Inc., Credit Suisse LLC and CSFB Corporation.

10. Upon information and belief, Credit Suisse Securities (USA) LLC ("**Credit Suisse LLC**") is a Delaware limited liability company in the financial services industry with its principal place of business in New York, NY. Credit Suisse LLC is a subsidiary of Defendant Credit Suisse Group. Prior corporate names of Credit Suisse LLC have included Credit Suisse First Boston LLC.

11. Upon information and belief, Credit Suisse First Boston Corporation ("**CSFB Corporation**") is a Massachusetts corporation in the financial services industry with its principal place of business in New York, NY. CSFB Corporation is a subsidiary of Defendant Credit Suisse Group. Prior corporate names of CSFB Corporation have included Credit Suisse First Boston Corporation, CS First Boston Corporation, The First Boston Corporation, and the First of Boston Corporation.

12. Upon information and belief, for purposes of Plaintiff's claims, the Defendants are the alter egos of one another because they are under common ownership and/or control and, at least with respect to the acts and/or omissions upon which Plaintiff's claims are based, such common owners and/or controlling persons have exercised complete domination over the Defendants' businesses and have used them interchangeably with no regard for their separate corporate identities, all in a manner that obfuscated their separate identities in their dealings with Plaintiff. (Defendants Credit Suisse Inc., Credit Suisse Group, Credit Suisse LLC, and CSFB Corporation are collectively referred to herein as "**Defendants**" or "**Credit Suisse**".)

4

## FACTUAL BACKGROUND

*Credit Suisse Group Acquires DLJ and Issues the Retention Plan*

13. In the Spring of 2000, after working as an investment banker for nearly thirty years, Callahan become employed by Donaldson Lufkin & Jenrette ("**DLJ**") as a Managing Director and co-head of DLJ's Chicago Investment Banking Group, with compensation of more than $1,650,000, along with other considerations and benefits.

14. Upon information and belief, on or about August 30, 2000, Credit Suisse Group and DLJ announced an agreement to combine their businesses via Credit Suisse's acquisition of DLJ in exchange for $11.5 billion, or $90 per DLJ share.

15. Upon information and belief, on or about November 3, 2000, Credit Suisse and DLJ closed the acquisition (the "**DLJ Acquisition**") and renamed the surviving company Credit Suisse First Boston (USA), Inc., which subsequently changed its name to become Defendant Credit Suisse Inc. The terms of the transaction required Credit Suisse to establish a retention pool valued at $1.2 billion in the aggregate, consisting of phantom shares relating to Credit Suisse Group common stock (the "**Phantom Shares**"). Credit Suisse established this pool as part of the Credit Suisse Group International Share Plan (the "**Retention Plan**").

16. Upon information and belief, the Retention Plan provides for participants to receive a retention award consisting of a certain number of Phantom Shares which, upon vesting, would convert into and be paid to the employee, in the form of a corresponding number of shares of Credit Suisse Group common stock (each such award, a "**Retention Award**"). Participating employees were granted Retention Awards of a certain dollar amount, which was translated into a certain number of Phantom Shares by dividing the dollar amount by the average closing price

of Credit Suisse Group shares for the five trading days up to and including the closing date of the DLJ Acquisition. The Retention Plan provided for Retention Awards to vest in three equal installments on each of July 1, 2001, July 1, 2002, and July 1, 2003, subject to acceleration of vesting of a Retention Award upon certain events, including Credit Suisse's termination without cause of a participant's employment.

17.     Plaintiff Callahan was a participant in the Retention Plan and was granted a Retention Award of $500,000, consisting of 2,619 Phantom Shares.

18.     On or about June 1, 2001, Defendants announced an alteration to the capital structure of Credit Suisse Group, consisting of a four-way stock split. As a result, Retention Award Phantom Shares also were split four ways, so that Callahan's Retention Award then consisted of 10,476 Phantom Shares, corresponding to 10,476 actual shares of Credit Suisse Group common stock.

19.     The first tranche of Callahan's Retention Award vested on July 1, 2001, resulting in 3,492 of Callahan's Phantom Shares converting into 3,492 shares of Credit Suisse Group common stock, paid and issued to Callahan. The balance of Callahan's Retention Award thereafter consisted of 6,984 Phantom Shares.

*Callahan's Employment After the DLJ Acquisition*

20.     In or around February 2001, Credit Suisse named Callahan Managing Director-Special Advisor of the Investment Banking Division. The terms of Callahan's employment as Managing Director-Special Advisor provided a base salary, a bonus pursuant to the DLJ Long Term Incentive Plan, an additional incentive bonus based upon Callahan's performance and contribution to Credit Suisse's profitability, as well as eligibility for all employee benefit plans

6

and full post-retirement medical benefits. These employment terms had no effect on Callahan's pre-existing rights under the Retention Plan.

21. Throughout 2001, Callahan was involved in and made significant contributions to various transactions that yielded substantial benefits to Credit Suisse. Nonetheless, in December 2001, Credit Suisse notified Callahan that his employment with Credit Suisse would terminate as of December 31, 2001. The termination of Callahan's employment was "without cause," within the meaning of the Retention Plan.

*Callahan's Separation from Credit Suisse*

22. On or about January 14, 2002, Credit Suisse offered Callahan a Separation Package consisting of a lump sum payment of a bonus for 2001 and also confirming Callahan's rights with respect to various benefits, including the full vesting of his Retention Award, the full vesting of his allocation in an incentive plan known as the "DLJ/LBO Incentive Plan," his total vested balance under the 401(k) Plan, his benefits under the Pension Plan, and other things like continued health and medical coverage (the "**2002 Separation Proposal**"). The 2002 Separation Proposal was delivered in the form of a "Separation Agreement," which included various releases and covenants designed to waive Callahan's rights to pursue claims against Credit Suisse.

23. Among other things, the 2002 Separation Proposal confirmed that the balance of Callahan's Retention Award had fully vested as a result of the termination of his employment without cause. Specifically, Exhibit A of the 2002 Separation Proposal stated:

> The vesting of the July 1, 2002 and the July 1, 2003 tranches of Credit Suisse Group phantom shares (6,984 shares) will vest on your Separation Date [defined as December 31, 2001] as the Company has terminated your employment without Cause. You

7

will be entitled to the settlement of these Awards within 120 days of your Separation Date.

24. Believing that his contributions to various transactions during 2001 entitled him to a considerably larger bonus for 2001 than Credit Suisse had offered in the 2002 Separation Proposal, Callahan declined the 2002 Separation Proposal and, following Credit Suisse's "internal grievance procedures," initiated an internal grievance to address his post-separation compensation.

25. Credit Suisse refused to increase its offer from the 2002 Separation Proposal and, instead, referred Callahan to Credit Suisse's "Dispute Resolution Program." In a letter dated July 19, 2002, George C. Whipple III, Esq. (an in-house lawyer and Managing Director of Credit Suisse) wrote to Callahan's attorney:

> Please find enclosed a copy of Credit Suisse First Boston's Employment Dispute Resolution Program (the "Program") and accompanying Request for Mediation form.
>
> The Program, which is a three-step process of dispute resolution procedures, provides that these procedures are the exclusive means by which an employee is able to seek resolution of his/her employment related dispute. The three components of the Program are internal grievance processing, mediation and arbitration. The three steps must be taken in sequence. As you have already completed the first step of this process, we should now proceed to mediation.

*Mediation Results in the March 6, 2003 Settlement Agreement*

26. On or about September 9, 2002, Callahan submitted his formal Request for Mediation. Pursuant to the Credit Suisse Dispute Resolution Program, mediation was initiated through JAMS, an independent provider of dispute resolution services.

27.     On or about March 6, 2003, a formal mediation was held before the JAMS-appointed mediator, Roger J. Ziman, Esq.  The result of the mediation was a handwritten settlement agreement, signed by Callahan and by Peggy Campbell on behalf of Credit Suisse, and signed by Mediator Roger J. Ziman, Esq. as a witness (the "**Settlement Agreement**").  The Settlement Agreement provides, in its entirety, as follows:

> *In the Matter of Callahan v. CSFB, LLC*
>
> *(1) CSFB agrees to pay Callahan the sum of $735,000 in total settlement of all claims by Callahan against CSFB from his prior employment;*
>
> *(2) This agreement is binding and the parties agree to execute a more formal settlement agreement and release, consistent with CSFB's standard settlement agreements;*
>
> *(3) With regard to Exhibit A of CSFB's Separation Agreement of Jan 14, 2002*
>
> > *item 1, the Retention Award, will be paid separate & apart from the total sum referred to above;*
> >
> > *item #2, Callahan's participation in the DLJ LBO incentive plan is fully vested[.]*
> >
> > *item #3, the Car has been purchased by Callahan;*
>
> *#4, [sic] Callahan's status in the PMD will be provided to him.*

28.     Paragraph "(3)" of the Settlement Agreement specifically refers to, and thereby incorporates by reference, Exhibit A of the 2002 Settlement Proposal, including its confirmation that the second and third tranches of Callahan's Retention Award (consisting of "6,974 shares" of Credit Suisse Group shares) had vested as of December 31, 2001.

*Negotiation of the "More Formal Agreement"*

29. On or about April 9, 2003, Credit Suisse sent to Callahan a proposed Separation Agreement (the "**2003 Separation Proposal**") which, according to the cover letter accompanying the document, "sets out the terms of our agreement as discussed at mediation on March 6, 2003." The 2003 Settlement Proposal provided for the $735,000 lump sum payment and the other consideration promised to Callahan in the Settlement Agreement, with the exception of Callahan's "status in the PMD," agreed to in paragraph "#4" of the Settlement Agreement.

30. Exhibit A to the 2003 Settlement Proposal once again confirms that the second and third tranches of Callahan's Retention Award, consisting of "6,984 shares," had vested as of December 31, 2001.

31. Callahan's "status in the PMD" consisted of an equity position that Callahan was entitled to in connection with one of the transactions Callahan had worked on for Credit Suisse. After receiving the 2003 Separation Proposal, Callahan requested from CSFB confirmation of his status in the PMD matter. Callahan negotiated in good faith with Credit Suisse to resolve the question of his status in the PMD; however, Credit Suisse claimed that Callahan's "status in the PMD" could not be confirmed. After many months turned into years of Credit Suisse's refusal to acknowledge Callahan's PMD status, it became apparent that Credit Suisse was manufacturing pretext and excuses in an effort to delay and/or avoid making good on its obligations to Callahan.

32. Eventually, Callahan relented and, in a good faith effort to compromise in spite of Credit Suisse's dilatory tactics, Callahan advised Credit Suisse that he would not press his contractual right to "his status in the PMD" if Credit Suisse would pay the other compensation

10

agreed to in the Settlement Agreement. Credit Suisse agreed and committed to send Callahan the "more formal settlement agreement" to conclude the transaction.

*Callahan and Credit Suisse Enter into the 2009 Separation Agreement*

33.     On or about April 7, 2009, Credit Suisse sent to Callahan a separation agreement, signed by George C. Whipple III, Esq., for Callahan's counter-signature (the "**2009 Separation Agreement**"). The 2009 Separation Agreement provided for the $735,000 lump sum payment to Callahan and, in Exhibit A, once again confirmed that Callahan's second and third tranches of his Retention Award, consisting of "6,974 shares" of Credit Suisse Group common stock, had vested as of December 31, 2001. Exhibit A of the 2009 Separation Agreement also confirmed that Callahan was fully vested in the DLJ Long Term Incentive Plan and his continuing rights under Credit Suisse's pension plan.

34.     Shortly after receiving the signed 2009 Separation Agreement, Callahan advised Credit Suisse that he was in full agreement with its terms and requested confirmation of certain non-substantive matters, such as a typographical error in Exhibit A stating the initial value of Callahan's Retention Award (*i.e.*, at the time of issuance in 2000) as $5,000 instead of $500,000 (this error had no substantive meaning, because the Retention Award was defined by a *number* of shares, *i.e.*, "6,974 shares," not by the *value* of those shares at any given point in time).

35.     Callahan signed the 2009 Separation Agreement on or about April 15, 2009 and subsequently returned it to Credit Suisse, including a handwritten correction of the typographical error in Exhibit A (which, as stated, had no substantive effect).

36.     Meanwhile, after Callahan had advised Credit Suisse that he was in full agreement with the 2009 Separation Agreement but before it had received Callahan's

countersignature on the 2009 Separation Agreement, Credit Suisse sent to Callahan a purported revision of the 2009 Separation Agreement, which inexplicably, without explanation and contrary to the provisions of the Settlement Agreement, purported to eliminate Callahan's right to the remaining 6,974 shares of Credit Suisse Group common stock that had previously vested under the Retention Plan (the "**Attempted Revision**").

37.     Callahan refused to accept the Attempted Revision and, instead, advised Credit Suisse that the 2009 Separation Agreement constituted the "more formal settlement agreement and release" referred to in the Settlement Agreement.

38.     Credit Suisse thereafter refused to pay to Callahan both the $735,000 and the 6,974 shares of Credit Suisse Group stock due to him under the Settlement Agreement and the 2009 Separation Contract, claiming that Callahan had rejected the 2009 Separation Agreement by correcting the non-substantive typographical error in Exhibit A.

### FIRST CLAIM FOR RELIEF

**Breach of Contract**
*(The 2009 Separation Agreement)*

39.     Plaintiff repeats and restates the allegations contained in paragraphs 1 through 38 above as if fully set forth herein.

40.     The 2009 Separation Agreement is a valid and binding contract between Callahan and Credit Suisse, supported by valid consideration.

41.     Callahan has fully performed under the 2009 Separation Agreement.

42.     The 2009 Separation Agreement obligated Credit Suisse to pay to Callahan a lump-sum payment of $735,000, which Credit Suisse has failed and refused to pay, thereby breaching the 2009 Separation Agreement.

43. The 2009 Separation Agreement obligated Credit Suisse to pay over to Callahan 6,974 shares of Credit Suisse Group common stock, which Credit Suisse has failed and refused to pay, thereby breaching the 2009 Separation Agreement.

44. Credit Suisse's breaches of the 2009 Separation Agreement have caused Callahan to suffer damages in an amount to be determined at trial, but believed to be in excess of $1,100,000.

## SECOND CLAIM FOR RELIEF
(in the alternative)

### Breach of Contract
*(The Settlement Agreement)*

45. Plaintiff repeats and restates the allegations contained in paragraphs 1 through 44 above as if fully set forth herein.

46. The Settlement Agreement is a valid and binding contract between Callahan and Credit Suisse, supported by valid consideration.

47. Callahan has fully performed under the Settlement Agreement.

48. The Settlement Agreement obligated Credit Suisse to pay to Callahan a lump-sum payment of $735,000, which Credit Suisse has failed and refused to pay, thereby breaching the 2003 Settlement Agreement.

49. The Settlement Agreement obligated Credit Suisse to pay over to Callahan 6,974 shares of Credit Suisse Group common stock, which Credit Suisse has failed and refused to pay, thereby breaching the Settlement Agreement.

50. The Attempted Revision also constituted a breach of the Settlement Agreement because it purported to substantively change the binding provisions of the Settlement Agreement

to Callahan's detriment by eliminating Callahan's right to the balance of his fully vested Retention Award.

51.     Credit Suisse's breaches of the Settlement Agreement have caused Callahan to suffer damages in an amount to be determined at trial, but believed to be in excess of $1,100,000.

### THIRD CLAIM FOR RELIEF
### (in the alternative)

### Breach of the Duty of Good Faith and Fair Dealing
### *(The Settlement Agreement)*

52.     Plaintiff repeats and restates the allegations contained in paragraphs 1 through 51 above as if fully set forth herein.

53.     The Settlement Agreement is a valid and binding contract between Callahan and Credit Suisse, supported by valid consideration.

54.     Paragraph "(2)" of the Settlement Agreement provides: "This agreement is binding and the parties agree to execute a more formal settlement agreement and release, consistent with CSFB's standard settlement agreements[.]"

55.     Implicit in paragraph "(2)" of the Settlement Agreement is a duty of good faith and fair dealing, requiring the parties to, among other things, negotiate in good faith the "more formal settlement agreement and release" and to do so in a manner consistent with the business terms of the Settlement Agreement.

56.  Credit Suisse breached its duty of good faith and fair dealing by failing to provide or acknowledge Callahan's "status in the PMD" and by using dilatory tactics to drag the negotiation of the "more formal settlement agreement" out over a period of years, all in an effort to circumvent its contractual obligations and disenfranchise Callahan.

57.  Credit Suisse breached its duty of good faith and fair dealing by attempting, in the Attempted Revision, to deprive Callahan of the fully vested Retention Award.

58.  Credit Suisse's breaches of the duty of good faith and fair dealing have caused Callahan to suffer damages in an amount to be determined at trial, but believed to be in excess of $1,100,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants awarding the following relief:

a.  On the First Claim for Relief, ordering Defendants to pay to Plaintiff damages in an amount to be determined at trial, but believed to be in excess of $1,100,000, plus interest at the statutory rate of 9% per annum and costs;

b.  On the Second Claim for Relief (in the alternative), ordering Defendants to pay to Plaintiff damages in an amount to be determined at trial, but believed to be in excess of $1,100,000, plus interest at the statutory rate of 9% per annum and costs;

   c. On the Third Claim for Relief (in the alternative), ordering Defendants to pay to Plaintiff damages in an amount to be determined at trial, but believed to be in excess of $1,100,000, plus interest at the statutory rate of 9% per annum and costs; and

   d. Ordering such other and further relief as the Court may deem just and proper.

Dated: June 11, 2010

                              ALL Counsel P.C.
                              By: Andrew L. Lee (AL-3765)
                              405 Lexington Ave. Fl. 26
                              New York, NY 10174
                              (212) 541-2429
                              alee@ALL-Counsel.com
                              *Counsel for Plaintiff Patrick J. Callahan, Jr.*