**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
PATRICK J. CALLAHAN, JR.,                        :
                                                 :
                        Plaintiff,               :           No. 10 Civ. 4599 (BSJ)
                                                 :
            v.                                    :
                                                 :
CREDIT SUISSE (USA), INC., CREDIT SUISSE         :
GROUP SA, CREDIT SUISSE SECURITIES (USA)         :
LLC, and CREDIT SUISSE FIRST BOSTON              :
CORPORATION,                                     :
                                                 :
                        Defendants.              :
----------------------------------------------------------------X

### MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

THOMPSON WIGDOR & GILLY LLP

Douglas H. Wigdor
Ariel Y. Graff
85 Fifth Avenue
New York, New York 10003
Tel: (212) 257-6800
Fax: (212) 257-6845
*dwigdor@twglaw.com*
*agraff@twglaw.com*

*COUNSEL FOR DEFENDANTS CREDIT SUISSE*
*(USA), INC., CREDIT SUISSE SECURITIES (USA)*
*LLC, and CREDIT SUISSE FIRST BOSTON*
*CORPORATION*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

STATEMENT OF FACTS.................................................................................................. 1

ARGUMENT ...................................................................................................................10

I.   PLAINTIFF'S SECOND AND THIRD CLAIMS, FOR BREACH OF THE
     SETTLEMENT TERM SHEET AND BREACH OF IMPLIED COVENANT OF GOOD
     FAITH AND FAIR DEALING WITH RESPECT THERETO, FAIL TO ALLEGE THE
     EXISTENCE OF AN ENFORCEABLE CONTRACT AND ARE, IN ANY EVENT,
     BARRED BY THE SIX-YEAR STATUTE OF LIMITATIONS .......................................11

     A.   The Settlement Term Sheet Was Merely A "Binding Preliminary
          Commitment" That Cannot Give Rise to a Claim for Breach of Contract ..........12

     B.   Even if the Settlement Term Sheet Constituted an Enforceable
          Contract, Plaintiff's Claims Would be Barred by the Statute of
          Limitations ..............................................................................................15

II.  PLAINTIFF'S FIRST CLAIM FAILS BECAUSE PLAINTIFF FAILED TO TIMELY
     ACCEPT – AND, MOREOVER, AFFIRMATIVELY *REJECTED* – THE PROPOSED
     APRIL 7, 2009 AGREEMENT .............................................................................16

     A.   Plaintiff Failed to Timely Accept the April 7, 2009 Formal Separation
          Agreement Until *After* Its Deadline Had Passed and It Was Formally
          Withdrawn and Replaced by the May 11, 2009 Formal Separation
          Agreement...............................................................................................16

     B.   Even if Plaintiff Had Timely Executed and Returned the April 7, 2009
          Formal Separation Agreement, His Handwritten Revision of "$5,000"
          to "$500,000" Constituted A Rejection and Counteroffer.....................................18

CONCLUSION.................................................................................................................23

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Adjustrite System v. GAB Business Services*,
145 F.3d 543 (2d Cir. 1998) ................................................................................... 12, 13, 14

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ................................................................................................ 10

*Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*,
No. 05 Civ. 8746 (DLC), 2006 U.S. Dist. LEXIS 5341 (S.D.N.Y. 2006) ............................ 11

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 10, 11

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ......................................................................................... 2

*Cortec Industrial, Inc. v. Sum Holding, L.P.*,
949 F.2d 42 (2d Cir. 1991) ........................................................................................... 2

*Field Day, LLC v. County of Suffolk*,
463 F.3d 167 (2d Cir. 2006) .......................................................................................... 1

*International Paper Co. v. Suwyn*,
966 F. Supp. 246 (S.D.N.Y. 1997) ................................................................................ 19

*John's Insulation, Inc. v. Siska Construction Co.*,
671 F. Supp. 289 (S.D.N.Y. 1987) ............................................................................... 20

*Knapp v. McFarland*,
344 F. Supp. 601 (S.D.N.Y. 1971) ............................................................................... 20

*Ladau v. The Hillier Group, Inc.*,
No. 02 Civ. 4703 (LAP), 2004 U.S. Dist. LEXIS 5339 (S.D.N.Y. Mar. 30, 2004) .............. 19

*Malone v. Bayerische Hypo-Und Vereins Bank*,
Nos. 08 Civ. 7277 (PGG), 09 Civ. 3676 (PGG),
2010 U.S. Dist. LEXIS 9529 (S.D.N.Y. Feb. 4, 2010) ...................................................... 15

*Mangiafico v. Blumenthal*,
471 F.3d 391 (2d Cir. 2006) ......................................................................................... 2

*McKenna v. Wright*,
386 F.3d 432 (2d Cir. 2004) .................................................................................... 13, 14

*National Market Share, Inc. v. Sterling National Bank*,
   392 F.3d 520 (2d Cir. 2004)..................................................................................11

*Rappaport v. Buske*,
   No. 98 Civ. 5255 (BSJ), 2000 U.S. Dist. LEXIS 12325 (S.D.N.Y. Aug. 24, 2000) ...... 13, 14

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000).................................................................................... 2

*Southwick Clothing LLC v. GFT (USA) Corp.*,
   No. 99 Civ. 10452 (GBD), 2004 U.S. Dist. LEXIS 25336 (S.D.N.Y. Dec. 13, 2004) .........17

*Staehr v. Hartford Finance Services Group*,
   547 F.3d 406 (2d Cir. 2008)..................................................................................15

*Teachers Insurance & Annuity Association v. Tribune Co.*,
   670 F. Supp. 491 (S.D.N.Y. 1987)..........................................................................13

*Terwilliger v. Terwilliger*,
   206 F.3d 240 (2d Cir. 2000)..................................................................................11

*Wasserstein Perella Emerging Markets Fin., L.P. v. Province of Formosa*,
   No. 97 Civ. 793 (BSJ), 2002 U.S. Dist. LEXIS 12012 (S.D.N.Y. July 1, 2002)....................19

*Winston v. Mediafare Entertainment Corp.*,
   777 F.2d 78 (2d Cir. 1986)....................................................................................13

**STATE CASES**

*American-European Art Assocs., Inc. v. Trend Galleries, Inc.*,
   641 N.Y.S.2d 835, 836 (1st Dep't 1996)....................................................................11

*Ely-Cruikshank Co. v. Bank of Montreal*,
   81 N.Y.2d 399 (N.Y. 1993)....................................................................................15

*Lakeville Pace Mech., Inc. v. Elmar Realty Corp.*,
   276 A.D.2d 673, 676 (2d Dep't 2000) .......................................................................11

*Poel v. Brunswick-Balke-Collender Co. of New York*,
   216 N.Y. 310, 319 (1915) .....................................................................................19

*Sheth v. New York Life Insurance Co.*,
   273 A.D.2d 72, 73 (1st Dep't 2000)..........................................................................11

*Wester v. Casein Co. of America*,
   206 N.Y. 506, 100 N.E. 488 (N.Y. 1912)....................................................................17

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 8(a)(2)......................................................................................................................10

Fed. R. Civ. P. 8(c)(1).......................................................................................................................15

Fed. R. Civ. P. 12(b)(6)........................................................................................................... 1, 10, 16

**MISCELLANEOUS**

New York Civil Practice Law and Rules § 213 .........................................................................15

5 Charles Alan Wright & Arthur R. Miller,
    Federal Practice and Procedure § 1226 (3d ed. 2004)........................................................15

Defendants Credit Suisse (USA), Inc., and Credit Suisse Securities (USA) LLC (also improperly impleaded as "Credit Suisse First Boston Corporation"), (collectively, "Defendants" or "Credit Suisse"),[1] respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Plaintiff's Complaint in its entirety and with prejudice.

As set forth in greater detail below, Plaintiff has asserted causes of action that are, on the face of the Complaint and the documents incorporated therein by reference, barred by the statutes of limitations and/or fail to state a claim upon which relief can be granted as a matter of law.  Accordingly, Plaintiff's Complaint should be dismissed with prejudice pursuant to Rule 12(b)(6).

## STATEMENT OF FACTS

In the Spring of 2000, Plaintiff Patrick J. Callahan, Jr. ("Plaintiff" or "Callahan") was employed as an investment banker with Donaldson, Lufkin & Jenrette ("DLJ").  (*See* Compl. ¶ 13).[2]  Later that year, DLJ was acquired by Credit Suisse, which continued to employ Callahan.  On April 3, 2001, pursuant to the terms of a written "Retention Plan" issued in connection with the acquisition of DLJ,[3] Credit Suisse granted Callahan a "Retention Award"

---

[1]     Defendant Credit Suisse Group SA has not filed an appearance in this action and, upon information and belief, does not exist.

[2]     References to Plaintiff's Complaint in this action, filed in the Southern District of New York on June 11, 2010, are abbreviated herein as "Compl. ¶ __."

[3]     A copy of the "Retention Plan," which is described at Compl. ¶ 15 and incorporated therein by reference, is annexed as Exhibit 1 to the Affidavit of LaTonya Sasser in Support of Defendants' Motion to Dismiss (hereinafter, the "Sasser Aff.").

The Exhibits annexed to the Sasser Aff. are properly before the Court in support of Defendants' motion pursuant to Fed. R. Civ. P. 12(b)(6).  *See generally Field Day, LLC v.*

1

of $500,000, comprised of 2,619 "Phantom Shares" that would convert to actual "Credit Suisse Group Shares" after vesting and settlement occurred.[4]  The shares were scheduled to vest in equal tranches on July 1, 2001, 2002, and 2003.  (*See* Compl. ¶ 16; Sasser Aff. Ex. 2). Pursuant to the terms of the Retention Plan and Callahan's Retention Award, Callahan would not be entitled to unvested tranches of the Retention Award in the event of Callahan's "voluntary resignation."  (Sasser Aff. Ex. 1, at 5 No. (i)).  However, in the event that Callahan were to be terminated "without Cause" after June 30, 2001, vesting of the remaining tranches of unvested shares would be accelerated to the date of termination.  (*Id.*).

In December 2001, Credit Suisse informed Callahan that he would be terminated "without cause" effective December 31, 2001.  (*See* Compl. ¶ 21).  On January 14, 2002, Credit Suisse offered Callahan a proposed separation agreement (the "January 14, 2002 Separation Agreement"), which outlined his entitlement to certain incentive compensation

---

*County of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) ("In considering a motion to dismiss for failure to state a claim, a district court may consider 'the facts stated in the complaint . . . and documents incorporated by reference in the complaint.'") (quoting *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)); *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) ("[D]ocuments that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit" may be incorporated.) (citation omitted); *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] . . . which is integral to the complaint, the defendant may produce [it] when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure.").

[4]      A copy of the "Retention Award," which is described at Compl. ¶ 16 and incorporated therein by reference, is annexed to the Sasser Aff. as <u>Exhibit 2</u>.

and included various covenants and releases.  (*See* Compl. ¶ 22; Sasser Aff. Ex. 3).[5]  Exhibit

"A" to the January 14, 2002 Separation Agreement provided, with respect to Callahan's

"Retention Award":

> Pursuant to the terms of your Retention Agreement with DLJ
> dated September 27, 2000, you were granted a Retention award
> with an initial total value of $5,000.  According to the terms of
> the Retention Award, vesting of the July 1, 2001 tranche of Credit
> Suisse Group phantom shares under the Retention Award has
> already occurred.  The vesting of the July 1, 2002 and the July 1,
> 2003 tranches of the Credit Suisse Group phantom shares (6,984
> shares) will vest on your Separation Date as the Company has
> terminated your employment without cause.  You will be entitled
> to the settlement of these Awards within 120 days of your
> Separation Date.

(Compl. ¶ 23; Sasser Aff. Ex. 3, at Ex. A, No. 1).

Insisting that he was entitled to a larger performance bonus than the January 14,

2002 Separation Agreement provided, Callahan rejected the January 14, 2002 Separation

Agreement, opting instead to initiate a grievance proceeding in accordance with Credit

Suisse's written "internal grievance procedures."  (*See* Compl. ¶ 24).  Step two of the

grievance procedure provided for mediation of all employment-related claims.  (*Id*. ¶ 25).

The parties participated in mediation on March 6, 2003, which concluded with the

execution of a hand-written settlement term sheet ("Settlement Term Sheet"), which the

parties contemplated would later be finalized in a formal agreement.[6]  The Settlement

Term Sheet provided in its entirety as follows:

---

[5]      A copy of the "January 14, 2002 Separation Agreement," which is described at
Compl. ¶ 22 and incorporated therein by reference, is annexed to the Sasser Aff. as <u>Exhibit 3</u>.

[6]      A copy of the Settlement Term Sheet, which is quoted at Compl. ¶ 27 and
incorporated therein by reference, is annexed to the Sasser Aff. as <u>Exhibit 4</u>.

*In the matter of Callahan v CSFB, LLC*

(1)     *CSFB agrees to pay Callahan the sum $735,000 in total settlement of all claims by Callahan against CSFB from his prior employment;*

(2)      *This agreement is binding and the parties agree to execute a more formal settlement agreement and release, consistent with CSFB's standard settlement agreements;*

(3)     *With regard to Exhibit of CSFB's Separation Agreement of Jan 14, 2002 item 1, the Retention Award, will be paid separate & apart from the total sum referred to above;*

*item #2, Callahan's participation in the DLJ LBO incentive plan is fully vested[;]*

*item #3, the Car has been purchased by Callahan;*

*#4, Callahan's status in the PMD will be provided to him.*

(Compl. ¶ 27; Sasser Aff. Ex. 4).

As contemplated by the Settlement Term Sheet, Credit Suisse provided Callahan with a proposed formal settlement agreement on April 9, 2003 (the "April 9, 2003 Formal Separation Agreement").[7]  Exhibit A to the proposed April 9, 2003 Formal Separation Agreement provided, with respect to Callahan's "Retention Award:"

Pursuant to the terms of your Retention Agreement with DLJ dated September 27, 2000, you were granted a Retention award with an initial total value of $500,000.  According to the terms of the Retention Award, vesting of the July 1, 2001 tranche of Credit Suisse Group phantom shares (3,492 shares) occurred on such date and vesting of the July 1, 2002 and the July 1, 2003 tranches of the Credit Suisse Group phantom shares (6,984 shares) occurred on your Separation Date as the Company terminated your employment without cause.  Payment of this Retention Award is separate and apart from the total sum referred to in paragraph 3 of this Separation Agreement.

---

[7]     A copy of the April 9, 2003 Formal Agreement, which is described at Compl. ¶¶ 29-30 and incorporated therein by reference, is annexed to the Sasser Aff. as Exhibit 5.

(Sasser Aff. Ex. 5, at Ex. A; *see also* Compl. ¶ 30).

However, Callahan maintained that the April 9, 2003 Formal Separation Agreement failed to identify his PMD status as required under ¶ 4 of the handwritten Settlement Term Sheet.[8]  (*See* Compl. ¶ 29; Sasser Aff. Ex. 4).  Callahan's counsel also subsequently forwarded to Credit Suisse a copy of the April 9, 2003 Formal Separation Agreement reflecting Callahan's proposed handwritten line edits.[9]  With respect to the provision for his Retention Award at Exhibit A, Callahan crossed out the phrase "[*as*] *the Company terminated your employment without Cause*" and replaced it with the handwritten emendation "[*as*] *You Retired*."  (*See* Sasser Aff. Ex. 6, at Ex. A).  Credit Suisse never agreed to Callahan's proposed edits, and, consequently, the April 9, 2003 Formal Separation Agreement was never consummated by the parties.

Years later, Callahan came back to Credit Suisse, agreeing to drop his insistence on PMD compensation if Credit Suisse would pay the other sums set forth in the Settlement Term Sheet and in the April 9, 2003 Formal Separation Agreement that he had previously rejected.  (Compl. ¶¶ 31-32).

---

[8]  "PMD" is not specifically defined in the Complaint, though it appears to be an alleged equity interest.

[9]  A copy of the April 9, 2003 Formal Agreement containing Callahan's handwritten line edits, as forwarded by his Counsel to Credit Suisse, is annexed to the Sasser Aff. as <u>Exhibit 6</u>. This document was marked-up by Callahan and is described at Compl. ¶ 31 ("Callahan negotiated in good faith with Credit Suisse") and incorporated therein by reference.

On April 7, 2009, Credit Suisse sent Callahan a new separation agreement (the "April 7, 2009 Formal Separation Agreement").[10]  Exhibit A to the new separation agreement provided, with respect to Callahan's "Retention Award:"

> Pursuant to the terms of your Retention Agreement with DLJ dated September 27, 2000, you were granted a Retention award with an initial total value of $5,000.  According to the terms of the Retention Award, vesting of the July 1, 2001 tranche of Credit Suisse Group phantom shares (3,492 shares) has already occurred.  The vesting of the July 1, 2002 and the July 1, 2003 tranches of the Credit Suisse Group phantom shares (6,984 shares) occurred on your Separation Date as the Company terminated your employment without cause.  You were entitled to the settlement of these Awards within 120 days of your Separation Date.

(Sasser Aff. Ex. 7; *see* Compl. ¶ 33).

The April 7, 2009 Formal Separation Agreement also provided, with respect to the manner of acceptance, that Callahan would:

> have twenty-one (21) days from your receipt of this Separation Agreement to review and consider it, and to consult with an attorney regarding the terms and effect of this Separation Agreement.  You will have seven (7) days after your execution of this Separation Agreement to revoke your acceptance.  Any revocation must be in writing and received by the undersigned by 5:00 p.m. on or before the seventh day after this Separation Agreement is executed by you.  If the Bank does not receive written revocation from you within such seven-day period, this Separation Agreement shall become effective upon expiration of such seven-day period.

(Sasser Aff. Ex. 7 ¶ 12).  Thus, Callahan had until April 28, 2009 to execute and return the April 7, 2009 Formal Separation Agreement.  (*Id.*).

---

[10]    A copy of the April 7, 2009 Separation Agreement, which is described at Compl. ¶ 33 and incorporated therein by reference, is annexed to the Sasser Aff. as <u>Exhibit 7</u>.

On April 13, 2009, Callahan's attorney, Benjamin D. Steiner, sent a letter by email to Credit Suisse.[11]  The letter stated in part that Steiner had forwarded a copy of the April 7, 2009 Formal Separation Agreement to Callahan, but it noted that "[u]nfortunately, he is out of the country at the moment and we have only communicated electronically."  (Sasser Aff. Ex. 8).  Steiner further stated that "Mr. Callahan is in full agreement with the body of the letter, however, he asked two or three questions regarding Exhibit A."  (*Id.*).  These included Callahan's belief that the value of the Retention Award stated in Exhibit A should be "$500,000" rather than "$5,000."  (*Id.*).  Callahan also requested confirmation that the Retention Award was deposited in an account that had been credited for any subsequent stock splits since the original date of the award.  (*Id.*).  Finally, Callahan requested that the following sentence be added: "Payment of this Retention Award is separate and apart from the total sum referred to in Paragraph 2 of this Separation Agreement."  (*Id.*).  Steiner's letter concluded as follows:  "*If we can get confirmation of these issues*, Mr. Callahan *will* sign the Separation Agreement upon his return to the country next week."  (*Id.*) (emphasis added).

Similarly, on May 7, 2009, more than three weeks later (and more than one week after the deadline to accept the April 7, 2009 Formal Separation Agreement had passed), Steiner sent an email to Credit Suisse, reiterating Callahan's position with respect to the value of the Retention Award stated in Exhibit A, and requesting that Credit Suisse "check

---

[11]     A copy of the April 13, 2009 letter, which is apparently described at Compl. ¶ 34 and incorporated therein by reference, is annexed to the Sasser Aff. as <u>Exhibit 8</u>.

again with your sources and see whether this is correct," because: "*If so,* we are *ready to sign* and get this over with."  (emphasis added).[12]

On May 11, 2009 – 13 days after the April 28, 2009 deadline – Credit Suisse withdrew the April 7, 2009 Formal Separation Agreement that Callahan had not accepted and proposed a new separation agreement (the "May 11, 2009 Formal Separation Agreement"),[13] which amended the Retention Award set forth at Exhibit A as follows:

> Pursuant to the terms of your Retention Agreement with DLJ dated September 27, 2000, you were granted a Retention award with an initial total value of $500,000.  According to the terms of the Retention Award, the July 1, 2001 tranche of Credit Suisse Group phantom shares under the Retention Award has vested. The July 1, 2002 and the July 1, 2003 tranches of the Credit Suisse Group phantom shares (6,984 shares) did not vest and were cancelled as a result of your retirement from the Bank, pursuant to the terms of the relevant plan documents.

(Sasser Aff. Ex. 10; *see* Compl. ¶ 36).

On May 21, 2009 – 23 days after April 28 – Steiner sent a letter to Credit Suisse, rejecting the May 11, 2009 Formal Separation Agreement and enclosing a copy of the April 7, 2009 Formal Separation Agreement that Callahan had allegedly signed and dated April 15, 2009.[14]  Steiner's May 21 letter did not explain how Callahan could have signed the April 7, 2009 Formal Separation Agreement on April 15, in light of Steiner's letter dated

---

[12]    A copy of Steiner's May 7, 2009 email to Credit Suisse is annexed to the Sasser Aff. as <u>Exhibit 9</u>.

[13]    A copy of the May 11, 2009 Formal Separation Agreement, which is described at Compl. ¶ 36 (the "Attempted Revision") and incorporated therein by reference, is annexed to the Sasser Aff. as <u>Exhibit 10</u>.

[14]    A copy of the May 21, 2009 letter enclosing an executed copy of the April 7, 2009 Formal Separation Agreement, and rejecting the May 11, 2009 Formal Separation Agreement (as described at Compl. ¶ 37 and incorporated therein by reference), is annexed to the Sasser Aff. as <u>Exhibit 11</u>.

Monday, April 13, 2009, which represented that Callahan would be out of the Country until "next week." (*Compare* Sasser Aff. Ex. 8, *with* Ex. 11). Nor did Steiner's letter explain how the April 7, 2009 Formal Separation Agreement could have been signed on April 15, 2009, when on May 7, 2009, Steiner had indicated that "if" a condition concerning his Retention Award were agreed to, his client was merely "ready to sign" (and presumably had not already done so). (*See id.* Ex. 9). Moreover, the executed April 7, 2009 Formal Separation Agreement also reflected Callahan's unilateral handwritten "correction" of the Retention Award provision, which replaced the initial total value of the Award stated at "$5,000" with the value "$500,000." (*See id.* Ex. 11; Compl. ¶ 35).

Credit Suisse maintained that it was not bound by the proposed April 7, 2009 Formal Separation Agreement that Callahan purportedly signed on April 15, 2009, because Callahan's "correction" of the apparent "typographical error" on Exhibit A constituted his rejection of that agreement. (*See* Sasser Aff. Ex. 11; Compl. ¶ 38). Moreover, the proposed April 7, 2009 Formal Separation Agreement was withdrawn after Callahan failed to communicate his acceptance for 34 days (thus plainly missing the 21-day deadline of April 28, 2009) and was subsequently formally withdrawn – and replaced by the proposed May 11, 2009 Formal Separation Agreement – ten days *before* Callahan's purported "acceptance" of the April 7, 2009 Formal Separation Agreement was ever communicated to Credit Suisse.

Thus, at the time of Callahan's purported acceptance of the April 7, 2009 Formal Separation Agreement, that agreement had been rejected by Callahan and subsequently also revoked by Credit Suisse (via the subsequently offered May 11, 2009 Formal Separation Agreement) and was no longer pending as an offer; the only offer then available

for Callahan to accept was the May 11, 2009 Formal Separation Agreement.  It is

undisputed that Callahan never accepted the May 11, 2009 Formal Separation Agreement.

## ARGUMENT

Pursuant to Fed. R. Civ. P. 12(b)(6), a complaint should be dismissed if it fails to

state a claim upon which relief can be granted.  Fed. R. Civ. P. 8(a)(2) requires "a short and

plain statement of the claim showing that the pleader is entitled to relief."  In *Ashcroft v.

Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court clarified this pleading obligation,

explaining that to survive a motion to dismiss: "a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face. . . .  The

plausibility standard is not akin to a probability requirement, but it asks for more than a

sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts

that are merely consistent with a defendant's liability, it stops short of the line between

possibility and plausibility of entitlement to relief."  *Id*. at 1949 (quotations omitted).  Thus,

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice. . . . Rule 8 . . . does not unlock the doors of discovery for a

plaintiff armed with nothing more than conclusions."  *Id*. at 1949-50 (citation omitted).

The "pleading standard Rule 8 announces . . . demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation. . . . Nor does a complaint suffice if it tenders

naked assertion[s] devoid of further factual enhancement."  *Id*. (citations omitted).

Where, as here, the "facts" are inadequate and inconsistent, and the complaint is

laden with conclusions of law that are plainly wrong, Plaintiff has not "nudged [his] claims

across the line from conceivable to plausible," and, as set forth below, has not

demonstrated an entitlement to relief on any of his claims.  *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007).

I.      **PLAINTIFF'S SECOND AND THIRD CLAIMS, FOR BREACH OF THE SETTLEMENT TERM SHEET AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING WITH RESPECT THERETO, FAIL TO ALLEGE THE EXISTENCE OF AN ENFORCEABLE CONTRACT AND ARE, IN ANY EVENT, BARRED BY THE SIX-YEAR STATUTE OF LIMITATIONS**

"To prevail on a breach of contract claim under New York law, a plaintiff must prove

(1) a contract; (2) performance of the contract by one party; (3) breach by the other party;

and (4) damages."  *See*, *e.g.*, *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000)

(internal quotation marks and citations omitted).  Moreover, under New York law, an

alleged "breach of the implied duty of good faith and fair dealing is [likewise] a breach of

the underlying contract."  *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d

Cir. 2004) (citations and internal quotation omitted).  Consequently, a "cause of action for

breach of an implied duty of good faith and fair dealing . . . [is] properly dismissed for lack

of a valid and binding contract from which such a duty would arise."  *Beekman Inv.*

*Partners, L.P. v. Alene Candles, Inc.*, No. 05 Civ. 8746 (DLC), 2006 U.S. Dist. LEXIS 5341, at

*19 (S.D.N.Y. 2006) (citing *American-European Art Assocs., Inc. v. Trend Galleries, Inc.*, 641

N.Y.S.2d 835, 836 (1st Dep't 1996)); s*ee also Sheth v. New York Life Ins. Co.*, 273 A.D.2d 72,

73 (1st Dep't 2000) ("cause of action for breach of the implied covenant of good faith and

fair dealing . . . may not be used as a substitute for a nonviable claim of breach of contract");

*Lakeville Pace Mech., Inc. v. Elmar Realty Corp.*, 276 A.D.2d 673, 676 (2d Dep't 2000) ("there

can be no covenant of good faith and fair dealing implied where there is no contract").

Here, Callahan's claims for breach of contract and/or breach of the covenant of good

faith and fair dealing in connection with the parties' 2003 Settlement Term Sheet fail to

state a valid claim and should be dismissed under Rule 12(b)(6) for at least two reasons.

First, the Settlement Term Sheet itself does not constitute an enforceable contract, and thus

cannot form the basis for Callahan's purported claims for "breach" of contract and/or

breach of the implied covenant of good faith and fair dealing.  These claims should

therefore be dismissed under Rule 12(b)(6) based on Callahan's failure to allege facts that,

if credited, could establish his entitlement to relief as a matter of law.  Second, even if the

Settlement Term Sheet *was* an enforceable contract, it was allegedly "breached" by Credit

Suisse's proffer of the purportedly non-conforming April 9, 2003 Formal Separation

Agreement, more than seven years before Callahan filed his Complaint.  Thus, even if the

Settlement Term Sheet could support a cause of action for breach of contract, the statue of

limitations on that claim expired more than one year before Callahan filed suit, providing

an independent basis for dismissal of the Second and Third Claims under Rule 12(b)(6).

### A. The Settlement Term Sheet Was Merely A "Binding Preliminary Commitment" That Cannot Give Rise to a Claim for Breach of Contract

The Second Circuit has recognized that "[p]arties to proposed commercial

transactions often enter into preliminary agreement[s]," which, like the Settlement Term

Sheet at issue here, "may provide for the execution of more formal agreements."  *See*

*Adjustrite Sys. v. GAB Bus. Servs.*, 145 F.3d 543, 547 (2d Cir. 1998) (applying New York law).

"Ordinarily, where the parties contemplate further negotiations and the execution of a

formal instrument, a preliminary agreement does *not* create a binding contract."  *Id.* at 548

(emphasis added).  Only where "the parties agree on *all* the points that require negotiation

but agree to memorialize their agreement in a more formal document," is an enforceable

"fully binding preliminary agreement" created, such that "a party may demand

performance of the transaction even though the parties fail to produce the 'more elaborate

formalization of the agreement.'"  *Id.* (quoting *Tchrs. Ins. & Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987)) (emphasis added).

In contrast to an enforceable "fully binding preliminary agreement," a "binding preliminary commitment" is created "when the parties agree on certain major terms, but leave other terms open for further negotiation."  *Adjustire*, 145 F.3d at 548.  A "'binding preliminary commitment' does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework."  *Id.* (internal quotation marks and citation omitted).  Thus, "if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing."  *Id.*

For a court confronted with the issue of determining whether a preliminary term sheet is binding, "[t]he key, of course is the intent of the parties: whether the parties intended to be bound, and if so, to what extent."  *Rappaport v. Buske*, No. 98 Civ. 5255 (BSJ), 2000 U.S. Dist. LEXIS 12325, at *14-15 (S.D.N.Y. Aug. 24, 2000) (citing *Adjustire*, 145 F.3d at 548-49).  "To discern that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'"  *Id.* (quoting *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1986)).

Here, Plaintiff's second and third causes of action arise out of Credit Suisse's purported breach of the handwritten Settlement Term Sheet that the parties executed during a private mediation session on March 13, 2003.  (*See* Compl. ¶ 27; Sasser Aff. Ex. 4).  In addition to memorializing the parties' "agree[ment] to execute a more formal settlement agreement and release, consistent with [Credit Suisse's] standard settlement agreements"

13

concerning various items that were agreed upon in principle at the mediation, the Settlement Term Sheet also noted that "Callahan's Status in the PMD" compensation program had not been resolved at the mediation, but rather "will be provided to him" in the course of further negotiations toward a final "more formal settlement agreement." (*Id.* ¶ 4).

Consistent with the commitment to further good faith negotiations embodied in the Settlement Term Sheet, the Complaint alleges that when Callahan was dissatisfied with the treatment of his PMD status proposed in Credit Suisse's more formal "2003 Separation Proposal," he proceeded to "negotiate[] in good faith with Credit Suisse to resolve the *question* of his status in the PMD." (*See* Compl. ¶ 31; Sasser Aff. Ex. 6) (emphasis added). Accepting Plaintiff's allegation as true, his conduct in negotiating over the terms of the proposed April 9, 2003 Formal Separation Agreement evidences his intent *not* to be bound by the Settlement Term Sheet, which was merely a "binding preliminary commitment" that memorialized "the parties['] agree[ment] on certain major terms, but [left] other terms open for further negotiation," including Callahan's status in the PMD program. *See Adjustrite*, 145 F.3d at 548; *Rappaport*, 2000 U.S. Dist. LEXIS 12325, at *23-24 ("Agreement on terms does not become binding until there is agreement on *all* terms as to which agreement was anticipated.") (emphasis added).

Thus, the parties' clear reservation in the Settlement Term Sheet of the issue of Callahan's PMD status pending further negotiations, and, ultimately, the execution of a formal, binding agreement – as well as Callahan's own engagement in such further negotiations in connection with the proposed April 9, 2003 Formal Separation Agreement – demonstrates that the Settlement Term Sheet was merely a "binding preliminary commitment" to engage in further negotiations preliminary to execution of a binding, final

14

contract.  Accordingly, Callahan cannot state a claim for "breach" of the Settlement Term

Sheet, and his Second and Third Causes of Action fail as a matter of law.

**B.      Even if the Settlement Term Sheet Constituted an Enforceable Contract, Plaintiff's Claims Would be Barred by the Statute of Limitations**

Pursuant to CPLR § 213, breach of contract claims are subject to a six-year statute of

limitations.[15]  The six-year limitations period begins to run at the time of the breach,

regardless of whether the plaintiff was acting in good faith and/or was unaware of the

breach until a later date.  *See Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 403

(N.Y. 1993).  Although the lapse of a limitations period is an affirmative defense that a

defendant must plead and prove (*see* Fed. R. Civ. P. 8(c)(1)), a defendant may also raise this

affirmative defense "in a pre-answer Rule 12(b)(6) motion if the defense appears on the

face of the complaint."  *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 426 (2d Cir. 2008)

(citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)); *see also* 5 CHARLES ALAN

WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1226 (3d ed. 2004) ("[T]he

current trend in the cases is to allow [the statute of limitations defense] to be raised by a

motion to dismiss under Rule 12(b)(6) when the defect appears on the face of the

complaint.").

Here, even if the Settlement Term Sheet was a "fully binding preliminary

agreement" amounting to an enforceable contract – which, as set forth above, it was not –

the alleged "breach" of the Settlement Term Sheet would have occurred when Credit Suisse

---

[15]      The same six-year limitations period applies to claims for breach of the implied
covenant of good faith and fair dealing.  *See*, *e.g.*, *Malone v. Bayerische Hypo-Und Vereins
Bank*, Nos. 08 Civ. 7277 (PGG), 09 Civ. 3676 (PGG), 2010 U.S. Dist. LEXIS 9529, at *12-13
(S.D.N.Y. Feb. 4, 2010) ("The claim for breach of the covenant of good faith and fair dealing
is grounded in contract and likewise has a limitations period of six years" pursuant to CPLR
§ 213(2).).

proffered the allegedly non-conforming April 9, 2003 Formal Separation Agreement.  *See*

Sasser Aff. Ex. 5 and Ex. 6; Compl. ¶¶ 29-31).  Indeed, Callahan alleges in the Complaint that

the April 9, 2003 Formal Separation Agreement failed to sufficiently identify his status in

the PMD matter – in violation of ¶ 4 of the Settlement Term Sheet.  (*Id.*).  Thus, even if

Callahan's subsequent course of negotiations do not demonstrate that the Settlement Term

Sheet was merely a binding preliminary commitment and not an enforceable contract, the

six-year statute of limitations for a cause of action based on the purported breach of the

Settlement Term Sheet would have expired on April 9, 2009 – six years after Credit Suisse

provided Callahan with the April 9, 2003 Formal Separation Agreement and more than one

year prior to Callahan's filing of his federal Complaint.  Plaintiff's Second and Third Claims,

for breach of the April 9, 2003 Formal Separation Agreement and its implied covenant of

good faith and fair dealing,[16] respectively, should therefore also be dismissed as time-

barred under Fed. R. Civ. P. 12(b)(6).

## II.   PLAINTIFF'S FIRST CLAIM FAILS BECAUSE PLAINTIFF FAILED TO TIMELY ACCEPT – AND, MOREOVER, AFFIRMATIVELY *REJECTED* – THE PROPOSED APRIL 7, 2009 FORMAL SEPARATION AGREEMENT

### A.   Plaintiff Failed to Timely Accept the April 7, 2009 Formal Separation Agreement Until *After* Its Deadline Had Passed and It Was Formally Withdrawn and Replaced by the May 11, 2009 Formal Separation Agreement

The April 7, 2009 Formal Separation Agreement expressly restricted the period of

time within which Callahan could accept, *viz.*, execution within 21 days, followed by a 7-day

---

[16]   As noted at page 10 above, any claim for breach of the implied covenant of good faith and fair dealing is dependent on the existence of an otherwise valid contract.  Since there is none here, this dependent claim for breach of duty cannot stand.  Moreover, even if the Settlement Term Sheet *was* a valid contract, Credit Suisse's alleged breach thereof (and of the covenant of good faith and fair dealing implicit therein) occurred far outside the six-year limitations period.

revocation period.  Callahan concededly failed to return an executed copy of this agreement to Credit Suisse until May 21, 2009 – 44 days later – when his attorney conveyed the purportedly executed copy to FedEx in response to having received Credit Suisse's new proposed May 11, 2009 Formal Separation Agreement.  Because the April 7, 2009 Formal Separation Agreement did not specify a method for Callahan to return his executed copy to Credit Suisse, "acceptance bec[ame] effective when mailed."  *See Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99 Civ. 10452 (GBD), 2004 U.S. Dist. LEXIS 25336, at *26 (S.D.N.Y. Dec. 13, 2004) (citing *Wester v. Casein Co. of Am.*, 206 N.Y. 506, 512 (1912) ("The contract springs into existence at the time of such mailing . . . .")) (citations omitted).

Thus, Callahan's purported "acceptance" of the April 7, 2009 Formal Separation Agreement occurred on May 21, 2009, when his counsel provided the purportedly executed copy to FedEx for delivery to Credit Suisse.  This acceptance was invalid, however, as the April 7, 2009 Formal Separation Agreement was withdrawn both because the 21-day deadline had passed and because Credit Suisse had replaced it with the May 11, 2009 Formal Separation Agreement prior to the mailing of Callahan's proposed revised executed copy.  Moreover, Credit Suisse's provision of the May 11, 2009 Formal Separation Agreement to Callahan was consistent with the acceptance deadline set forth in the April 7, 2009 Formal Separation Agreement – namely, 21 days, or April 28, 2009 – as the May 11, 2009 Formal Separation Agreement was proposed 8 days *after* Callahan failed to meet his April 28, 2009 deadline to accept the April 7, 2009 Formal Separation Agreement.

Accordingly, the April 7, 2009 Formal Separation Agreement was no longer available for Callahan to accept when he purported to do so on May 21, 2009, and his

purported acceptance does not bind Credit Suisse to the terms of the April 7, 2009 Formal Separation Agreement.

### B. Even if Plaintiff Had Timely Executed and Returned the April 7, 2009 Formal Separation Agreement, His Handwritten Revision of "$5,000" to "$500,000" Constituted A Rejection and Counteroffer

Even assuming that Callahan had timely communicated his alleged "acceptance" of the April 7, 2009 Formal Separation Agreement before it was withdrawn and superseded by the May 11, 2009 Formal Separation Agreement (which, as set forth above, he did not), Callahan's purported "acceptance" was conditioned on Credit Suisse, in turn, accepting his handwritten alteration of the value of the retention Award from $5,000 to $500,000. This alteration was stated as a condition for Callahan's execution of the April 7, 2009 Formal Separation Agreement in his counsel's letter to Credit Suisse dated April 13, 2009 (*see* Sasser Aff. Ex. 8 and Ex. 9), and was incorporated by handwritten notation into the executed version of the April 7, 2009 Formal Separation Agreement that Callahan ultimately returned to Credit Suisse, together with his explicit rejection of the May 11, 2009 Formal Separation Agreement, on May 21, 2009 (*see id*. Ex. 11). Far from evidencing Callahan's "acceptance" of the April 7, 2009 Formal Separation Agreement, however, Callahan's alteration of the value of the award constituted a rejection and counteroffer to Credit Suisse's proposal. As such, Callahan never accepted Credit Suisse's proposed April 7, 2009 Formal Separation Agreement, nor does he allege that Credit Suisse ever accepted the counter-offer to that agreement that Callahan provided to Credit Suisse on May 21, 2009. Thus, no enforceable contract was entered into on the basis of the April 7, 2009 Formal Separation Agreement, and Callahan's first cause of action alleging breach of that agreement fails to state a claim and should be dismissed under Rule 12(b)(6).

18

New York follows the traditional common law "mirror image" rule, "which holds that an acceptance that is conditioned on terms at variance with those in the offer operates as a counteroffer and terminates the original offer." *Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246, 253 (S.D.N.Y. 1997) (citations omitted); *see also Wasserstein Perella Emerging Mkts. Fin., L.P. v. Province of Formosa*, No. 97 Civ. 793 (BSJ), 2002 U.S. Dist. LEXIS 12012, at *40 (S.D.N.Y. July 1, 2002) ("A proposal to accept the offer if modified or an acceptance subject to other terms and conditions [is] equivalent to an absolute rejection of the offer.") (quoting *Poel v. Brunswick-Balke-Collender Co. of New York*, 216 N.Y. 310, 319 (1915)). Indeed, only expressions of assent by an offeree that "contain *immaterial deviations* from the original offer" can "operate to bind the parties to an enforceable contract" without constituting rejections and counter-offers. *Int'l Paper Co.*, 966 F. Supp. at 253 (citations omitted).

For example in *International Paper*, an employee returned an executed copy of an employment agreement with an enclosed side letter describing his non-literal interpretation of the agreement's non-compete provision, and stating that, "It is with the understanding above that I have signed the Agreement." *Id.* at 252.  Under those circumstances, the court determined that the "with the understanding" language of the side-letter qualified essential terms of the agreement, and made it "far from clear that the contract would have been acceptable to [plaintiff] if the changes were not granted." *Id.* at 254.  Thus, the side-letter constituted a counter-offer, and the employee's signature on the agreement did not give rise to an enforceable contract. *Id.*; *see also Ladau v. The Hillier Group, Inc.,* No. 02 Civ. 4703 (LAP), 2004 U.S. Dist. LEXIS 5339, at *11-12 (S.D.N.Y. Mar. 30, 2004) (holding that employee's letter stating "acceptance of" offer and also specifying

19

additional "mutually understood and agreed" terms did not constitute "clear, ambiguous and unequivocal" acceptance, and therefore operated as rejection and counteroffer).

Consistent with these applications of the "mirror image rule," cover letters that merely set forth a "suggestion, request or overture" – the grant of which is neither an express nor an implied condition for acceptance, do not constitute a rejection and counteroffer. *See*, *e.g.*, *John's Insulation, Inc. v. Siska Constr. Co.*, 671 F. Supp. 289, 293 (S.D.N.Y. 1987) ("Although [defendant's] statement that 'the clause about actions should really be . . . Massachusetts' is arguably an imperative statement that would ordinarily constitute a counteroffer, [defendant] negated the effect of that language by concluding the paragraph with the phrase, 'but we won't dwell on the wording.'"); *Knapp v. McFarland*, 344 F. Supp. 601 (S.D.N.Y. 1971), *aff'd in part & rev'd in part on other grounds*, 457 F.2d 881 (2d Cir. 1972), *cert. denied*, 409 U.S. 850 (1972) (holding that request for extension of payment deadline in letter manifesting unequivocal acknowledgment of, and willingness to pay, disputed bonus, constituted "immaterial deviation from the original offer" and created enforceable contract, rather than counteroffer).

Here, Callahan's revision of the value of his Retention Award – from $5,000 to $500,000 – was a material deviation that constituted a rejection of, and counteroffer to, the April 7, 2009 Formal Separation Agreement under these standards (even assuming that Callahan had timely accepted the agreement, which, as set forth above, he did not). Although the letter from Callahan's attorney to Credit Suisse, dated April 13, 2009, states that Callahan was in "full agreement" with the April 7, 2009 Formal Separation Agreement, it also raised multiple issues – including the value of Callahan's Retention Award – and expressly conditioned Callahan's acceptance on Credit's Suisse's acquiesce to Callahan's

proposed resolution of those issues, stating that only: "If we can get confirmation of these issues, Mr. Callahan will sign the [April 7, 2009 Formal] Separation Agreement upon his return to the country next week." (*See* Sasser Aff. Ex. 8; Compl. ¶ 34).  Similarly, the email from Callahan's attorney dated May 7, 2009 reiterated that, subject to Credit Suisse's modification of the value of the retention award from $5,000 to $500,000, "we are ready to sign and get this over with." (Sasser Aff. Ex. 9).  Callahan's unilateral alteration of the value of his retention award was therefore a "material" deviation from – and thus a rejection and counteroffer to – Credit Suisse's April 7, 2009 Formal Separation Agreement, rather than a binding "acceptance" under the mirror image rule.

Moreover, the materiality of Callahan's revision of the value of the retention award from $5,000 to $500,000 is also evidenced by the terms of the Retention Plan and Callahan's Retention Award – which Exhibit "A" to the various versions of the formal separation agreement cites as the basis for the award's valuation.  Specifically, the April 9, 2003 Formal Separation Agreement – which was returned to Credit Suisse with Callahan's handwritten proposed revisions by letter dated October 14, 2003 (*see id.* Ex. 6) – reflects that Callahan crossed out the statement "the Company terminated your employment without Cause," and replaced it with the statement "you retired." (*Id.*).  However, the Retention Plan governing Callahan's Retention Award (*see id.* Ex. 1 and Ex. 2) provides that in the event of a "Voluntary Resignation," unvested retention awards will not be delivered (*id.* Ex. 1, at Ex. B).  Thus, pursuant to Callahan's prior handwritten revision to the April 9, 2003 Formal Separation Agreement, his entitlement to any further tranches of the Award was extinguished by his asserted "voluntary retirement" from the Company.  This is consistent with the May 11, 2009 Formal Separation Agreement that Credit Suisse

21

ultimately proposed, which states that Callahan's remaining tranches of shares "did not vest and were cancelled as a result of your retirement from the bank." (*See id.* Ex. 10, at Ex. A). The fact that the April 7, 2009 Formal Separation Agreement indicated that Callahan was entitled to any further Award at all (in light of Callahan's previously asserted "retirement") is further evidence of the materiality of his alteration of the value of that Award from $5,000 to $500,000, reinforcing that such alteration constituted a rejection and counteroffer under the mirror image rule.

Thus, even if Callahan had timely accepted the April 7, 2009 Formal Separation Agreement before its deadline had passed and it was withdrawn and replaced by the May 11, 2009 Formal Separation Agreement, Callahan's alteration of the value of his retention award from $5,000 to $500,000 demonstrates that his purported acceptance was, to the contrary, a rejection and counteroffer. Accordingly, Callahan never accepted the April 7, 2009 Formal Separation Agreement, and his First Cause of Action alleging breach of that agreement should be dismissed for failure to state a claim under Rule 12(b)(6).

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court dismiss

Plaintiff's Complaint against them in its entirety, with prejudice.

Dated: July 30, 2010
       New York, New York

Respectfully submitted,

**THOMPSON WIGDOR & GILLY LLP**

By: _____
       Douglas H. Wigdor
       Ariel Y. Graff

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@twglaw.com
agraff@twglaw.com

*COUNSEL FOR DEFENDANTS CREDIT
SUISSE (USA), INC., CREDIT SUISSE
SECURITIES (USA) LLC, and CREDIT
SUISSE FIRST BOSTON CORPORATION*