UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICK J. CALLAHAN, JR.

                              Plaintiff,

            v.

CREDIT SUISSE (USA), INC., CREDIT SUISSE
GROUP SA, CREDIT SUISSE SECURITIES
(USA) LLC, and CREDIT SUISSE FIRST
BOSTON CORPORATION,

                              Defendants.

Civ. No.: 10 Civ. 4599 (BSJ) (JLC)

# MEMORANDUM OF LAW
# IN OPPOSITION TO MOTION TO DISMISS

ALL Counsel P.C.
By:  Andrew L. Lee (AL-3765)
405 Lexington Ave. Fl. 26
New York, NY 10174
(212) 541-2429
alee@ALL-Counsel.com
*Counsel for Plaintiff Patrick J. Callahan, Jr.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ....................................................................................................................... 1

ALLEGATIONS OF THE COMPLAINT .................................................................................. 2

ARGUMENT ............................................................................................................................... 6

    I.   The Settlement Agreement is a Binding and Enforcable Contract ..................................... 7

    II.  Callahan's Claims Are Not Barred by the Statute of Limitations ................................... 10

        A.  Callahan's Claims Accrued Less Than Six Years Prior to Filing Suit ...................... 11

        B.  Defendants' Written Affirmations of Their Obligations Preclude the Statute of
            Limitations from Barring Callahan's Claims ............................................................ 14

        C.  Defendants Should be Equitably Estoped from Asserting a Limitations Defense ... 17

    III.  The Complaint Sufficiently Alleges Breach of the 2009 Separation Agreement ............ 19

        A.  The Complaint Alleges that the 2009 Separation Agreement is a Binding
            Contract ...................................................................................................................... 19

        B.  Callahan Accepted, and Did Not Reject, the 2009 Separation Agreement ............... 20

CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Adjustrite Systems, Inc. v. GAB Bus. Svcs., Inc.*, 145 F. 3d 543 (2d Cir. 1998) ...................... 8, 10

*Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir. 1989) ................................. 8

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................................... 6

*B. Lewis Prods., Inc. v. Angelou*, 2003 WL 21709465 (S.D.N.Y. July 23, 2003),
*vacated in part on other grounds and remanded by* 2004 WL 1147071
(2d Cir. May 21, 2004) ................................................................................................................. 8

*Cerbone v. Int'l Ladies' Garment Workers*, 768 F.2d 45, 50 (2d Cir. 1985) ............................. 17

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) .................................................. 6-7

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ....................................... 6-7

*DiBlasio v. Novello*, 344 F.3d 292 (2d Cir. 2003) ....................................................................... 6

*Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470 (S.D.N.Y. 2009) ............................... 12-17

*First Am. Title Ins. Co. v. Fiserve Fulfillment Svcs, Inc.*, 2008 WL 282019
(S.D.N.Y. Jan. 25, 2008) ............................................................................................................ 17

*Flight Sciences, Inc. v. Cathay Pacific Airways Ltd.*, 647 F. Supp. 2d 285
(S.D.N.Y. 2009) ...................................................................................................................... 13-14

*Guilbert v. Gardner*, 480 F.3d 140 (2d Cir. 2007) ............................................................... 12, 14

*Haber v. Gutmann*, 64 A.D.3d 1106, 882 N.Y.S.2d 780 (3d Dep't 2009) .................................. 13

*Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246 (S.D.N.Y. 1997) .................................................... 20

*Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247 (S.D.N.Y. 2008) .......................................... 13

*Krumme v. Westpoint Stevens Inc.*, 143 F.3d 71 (2d Cir. 1998) ........................................... 22, 23

*Liddle & Robinson, LLP v. Garrett*, 2010 WL 2628656 (S.D.N.Y. July 1, 2010) ..................... 24

*Marks v. New York Univ.*, 61 F. Supp. 2d 81 (S.D.N.Y. 1999) ................................................... 20

*Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175 (S.D.N.Y. 2007) ................. 7

*Robinson v. Pan Am. World Airways, Inc.*, 645 F. Supp. 70 (S.D.N.Y. 1986)............................ 17

*Robinson v. Pan Am. World Airways, Inc.*, 650 F. Supp. 125 (S.D.N.Y. 1986)......................... 18

*Teacher's Ins. & Ann. Ass'n v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987) .............. 8, 9, 10

*United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO v. Great Am. Indus., Inc.*, 479 F. Supp. 216  (S.D.N.Y. 1979)......................................................... 14

*Valashinas v. Koniuto*, 283 A.D. 13, 125 N.Y.S.2d 554 (3d Dep't 1953), *aff'd*, 308 N.Y. 233, 124 N.E.2d 300 (1954) ........................................................................ 22, 23

## STATUTES & OTHER AUTHORITIES

29 U.S.C.A. § 626(f)(1)(F)(i).......................................................................... 20

N.Y. Gen. Ob. L. § 17-101 (McKinney's 2010).................................................14-16

N.Y. C.P.L.R. § 213 (McKinney's 2010) ...........................................................10-11

**INTRODUCTION**

Plaintiff Patrick J. Callahan, Jr. ("Callahan") filed this action against his former employer

and its affiliates,  Credit Suisse (USA), Inc., Credit Suisse Group SA, Credit Suisse Securities

(USA) LLC, and Credit Suisse First Boston Corporation (collectively, "Defendants")[1] for their

failure to honor the severance arrangements they agreed to after terminating his employment

without cause.  Callahan's claims are for breach of contract and breach of the duty of good faith

and fair dealing, seeking damages resulting from Defendants' failure to pay the $735,000

severance payment they agreed to and their failure to turn over 6,974 shares of publicly-traded

Credit Suisse Group common stock that Callahan is entitled to.

Defendants do not dispute their failure to make the payment or deliver the stock.  They

do not dispute that Callahan earned the payment and the stock.  They do not dispute that they

*agreed* to make the payment and deliver the stock.  Instead, Defendants motion argues that

Callahan is out of luck because he waited too long and asked too many questions.

> *First*, Defendants argue that the Settlement Agreement is not a binding
> agreement, even though it says: "This agreement is binding."  The
> Settlement Agreement does contemplate a "more formal settlement
> agreement and release," but that does not preclude its enforcement under
> New York Law.  Defendants admit the Settlement Agreement is
> enforceable with respect to Defendants' failure to negotiate in good faith.
>
> *Second*, Defendants argue that the six-year statute of limitations bars
> Plaintiffs' claims for breach of the Settlement Agreement and breach of
> the duty of good faith and fair dealing.  To the contrary, while the
> Settlement Agreement itself is from 2003, the breaches sued upon here all
> occurred within the limitations period.  Further, Defendants' own conduct
> tolled the limitations period, both because they acknowledged their
> obligations in subsequent writings and because they engaged in a

---

[1]  The Complaint alleges that, for purposes of Plaintiff's claims, the Defendants are the alter egos of one
another.  (Compl. ¶ 12.)  Defendants' motion does not challenge that allegation.

campaign of bad faith conduct designed to delay Callahan into forfeiting his rights.

_Third_, Defendants argue that, even though they signed and sent the "more formal settlement agreement and release" referred to in the Settlement Agreement and even though Callahan agreed to it and signed it, Callahan's acceptance was really a rejection and counter-offer because he made a handwritten change to the document. But the law is clear that an immaterial deviation in an acceptance does not render the acceptance ineffective. Here, not only was the change an immaterial correction of a typographical error, but Defendants' own subsequent document also corrected the error, confirming that it was not a material change.

Defendants' arguments all are without merit. For the reasons stated below, Plaintiff respectfully submits that Defendants' motion should be denied.

## ALLEGATIONS OF THE COMPLAINT

In 2000, upon acquiring Callahan's employer, Donaldson, Lufkin & Jenrette ("DLJ"), Defendants established a "Retention Plan" for certain retained DLJ employees, including Callahan. (_Id._ at 16-17.) Under the plan, "Retention Awards" consisted of a certain number of "phantom shares" that would, upon vesting, convert into the same number of publicly-traded Credit Suisse Group shares. (_Id._ ¶ 16.) The number of phantom shares was determined by dividing the initial dollar value of the retention award by the average stock price during the five days leading up to Defendants' acquisition of DLJ. (_Id._ ¶ 16.) Callahan's Retention Award had an initial value of $500,000, which translated into 10,476 phantom shares. (_Id._ ¶¶ 16-17.) Retention Plan phantom shares vested in three equal "tranches," on July 1 of each of 2001, 2002, and 2003. (_Id._ ¶ 16.)

Callahan's first tranche vested on July 1, 2001, leaving his unvested balance as 6,974 phantom shares. (_Id._ ¶ 19.) In December 2001, however, Defendants terminated Callahan's employment without cause. (_Id._ ¶¶ 1, 21 & 23.) The Retention Plan provided for "acceleration of vesting of a Retention Award upon certain events, including Credit Suisse's termination

2

without cause of a participant's employment." (*Id.* ¶ 16.)  Accordingly, Callahan's remaining balance of 6,974 phantom shares became fully vested.  (*Id.* ¶ 23, 28, 30, 33.)

Defendants offered Callahan a separation package on January 14, 2002 (the "2002 Separation Proposal"), (*id.* ¶ 22), which stated that Callahan had been terminated without cause and that, as a result, his "6,974 shares" of retention award stock had vested in full.  (*Id.* ¶¶ 22-23.)  Not satisfied with the 2002 Separation Proposal as it related to his 2001 bonus, Callahan initiated mediation pursuant to Defendants' mandatory dispute resolution procedures.  (*Id.* ¶¶ 25-26.)  The result was a handwritten and expressly "binding" settlement agreement, signed by Callahan, by an official of Defendants on their behalf, and by the JAMS-appointed mediator (the "Settlement Agreement").  (*Id.* ¶ 27.)  The Settlement Agreement provides, in its entirety:

> *In the Matter of Callahan v. CSFB, LLC*
>
> *(1) CSFB agrees to pay Callahan the sum of $735,000 in total settlement of all claims by Callahan against CSFB from his prior employment;*
>
> *(2) This agreement is binding and the parties agree to execute a more formal settlement agreement and release, consistent with CSFB's standard settlement agreements;*
>
> *(3) With regard to Exhibit A of CSFB's Separation Agreement of Jan 14, 2002*
>
> *item 1, the Retention Award, will be paid separate & apart from the total sum referred to above;*
>
> *item #2, Callahan's participation in the DLJ LBO incentive plan is fully vested[.]*
>
> *item #3, the Car has been purchased by Callahan;*
>
> *#4, [sic] Callahan's status in the PMD will be provided to him.*

(*Id.*)  The Settlement Agreement specifically refers to, and thereby incorporates by reference, Exhibit A of the 2002 Settlement Proposal, including its confirmation that the balance of

Callahan's retention award (6,974 shares) had vested as of December 31, 2001 because Defendants had terminated Callahan without cause.  (*Id.* ¶ 28.)

On April 9, 2003, Defendants sent Callahan a proposed separation agreement (the "2003 Separation Proposal") purporting to comply with the Settlement Agreement but omitting Callahan's right to equity in "the PMD" (one of the transactions that Callahan had worked on for Defendants).  (*Id.* ¶¶ 29, 31)  Exhibit A to the 2003 Settlement Proposal states that the balance of Callahan's retention award (6,974 shares) had vested as of December 31, 2001 because Defendants had terminated Callahan without cause.  (*Id.* ¶ 30.)

Callahan thereafter negotiated in good faith with Defendants towards the "more formal settlement agreement and release" referred to in the Settlement Agreement, on terms consistent with the Settlement Agreement (*i.e.*, including Callahan's PMD equity).  (*Id.* ¶¶ 31-32.) Defendants, however, claimed that Callahan's PMD equity could not be confirmed.  (*Id.* ¶ 31.) Defendants engaged in a campaign of bad faith conduct designed to circumvent their contractual obligations and to disenfranchise Callahan.  (*Id.* at 2-4, 29, 31-32, & 56-57.)  With the result that "many months turned into years," Defendants used dilatory tactics (*id.* ¶¶ 31-32, 56), sought to "impose various release[s] and waivers of Callahan's rights, but each varied the prior package to which Credit Suisse had agreed in writing" (*id.* ¶ 2), presented Callahan with the illusory prospect of getting paid while in reality using delay and bad faith negotiation to force him into submission on point after point" (*id.* ¶ 3), and consistently refused to acknowledge Callahan's right to the PMD equity agreed to in the Settlement Agreement (*id.* ¶ 31).

Callahan finally gave in, and advised Defendants that he would forego his PDM equity if Defendants would finally pay the other compensation agreed to in the Settlement Agreement. (*Id.* ¶ 32.)  Defendants agreed and committed to send a "more formal settlement agreement" to

4

conclude the transaction.  (*Id.*)  On April 7, 2009, Defendants sent to Callahan a signed separation agreement (the "2009 Separation Agreement").  (*Id.* ¶ 33).  The 2009 Separation Agreement acknowledges that the balance of Callahan's retention award (6,974 shares) had vested as of December 31, 2001 because Defendants had terminated Callahan without cause. (*Id.*)  The 2009 Separation Agreement also acknowledges that Defendants would pay to Callahan the $735,000 lump-sum "pursuant to" the Settlement Agreement.  (*Id.*)

Shortly after receiving the signed 2009 Separation Agreement, and before April 15, 2009, Callahan conveyed his acceptance of the 2009 Separation Agreement, stating he was "in full agreement" with its terms and requesting confirmation of certain non-substantive matters, such as a typographical error in the Exhibit misstating the initial value of Callahan's Retention Award (*i.e.*, at the time of issuance in 2000) as $5,000 instead of $500,000.  (*Id.* ¶¶ 34-35.)  This error had no substantive meaning, because the Retention Award consists of a *number* of shares, *i.e.*, "6,974 shares," regardless of their *value* at any given point.  (*Id.*)

Callahan signed the 2009 Separation Agreement on or about April 15, 2009 and subsequently returned it to Defendants, including a handwritten correction of the typographical error in Exhibit A (which, as stated, had no substantive effect).  (*Id.* ¶ 35.)  After Callahan conveyed his agreement to the 2009 Separation Agreement but before Defendants had received Callahan's countersignature, Defendants sent to Callahan a "revision" of the 2009 Separation Agreement, purporting to cancel Callahan's 6,974 shares of vested Retention Award stock (the "Attempted Revision").  (*Id.* ¶ 36.)  Defendants thereafter refused to pay Callahan the $735,000 or to deliver the 6,974 shares of stock, claiming that Callahan had rejected the 2009 Separation Agreement by correcting the non-substantive typographical error in Exhibit A.  (*Id.* ¶ 38.)

5

On June 11, 2010, Callahan commenced this suit for breach of the 2009 Separation Agreement and, in the alternative, breach of the Settlement Agreement and breach of the duty of good faith and fair dealing.

## ARGUMENT

On a motion to dismiss, the Court, presuming all "well pleaded factual allegations" to be true, must determine whether those allegations "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. Facial plausibility is a "context-specific" concept, requiring more than a "sheer possibility" but less than a "probability" that a defendant has acted unlawfully. *Id.* at 1949-50. Resolution of factual disputes is not appropriate on a motion to dismiss. *E.g.*, *DiBlasio v. Novello*, 344 F.3d 292, 304 (2d Cir. 2003).

Facial plausibility depends on the complaint, documents attached to it as exhibits, and documents that it expressly incorporates, but any document extraneous to the complaint may not be considered unless the complaint relies heavily upon its terms and effect to an extent that makes the document integral to the complaint itself. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."); *Cortec Indus., Inc. v. Sum*

---

[2] Although allegations amounting to nothing more than "legal conclusions" are not entitled to a presumption of truth, *Iqbal*, 129 S. Ct. at 1949, Defendants' motion here is based exclusively on the plausibility of the factual allegations of the Complaint: while the preamble to Defendants' "Argument" section (Moving Br. at 10-11) summarily claims that "the complaint is laden with conclusions of law that are plainly wrong," the actual argument does not identify any allegations as conclusions of law. (Moving Br. *passim*.)

*Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (holding that, on a motion to dismiss, a court may consider a document other than an exhibit to a complaint only if it is one on which the plaintiff "solely relies and which is integral to the complaint.").  For example, in *Pearce v. Manhattan Ensemble Theater, Inc.*, the complaint alleged an oral contract on certain terms and the motion to dismiss attacked those allegations by submitting an unsigned draft agreement that the defendant claimed to have sent to the plaintiff.  528 F. Supp. 2d 175, 179 (S.D.N.Y. 2007).  Because the draft was not referenced in the complaint and its effect on the parties' relationship was disputed, the Court held, "[b]y the Second Circuit's standards . . . the Court cannot consider the draft agreement in deciding this motion."  *Id.* at 178-79.  Similarly, here, Defendants' motion is based heavily on extraneous documents neither referred to in, nor relied upon by, the Complaint (including Exhibits 1, 2, 6, and 9, and the first document comprising Exhibit 11 of the Affidavit of Latonya Sasser ("Sasser Aff.")) and the Court should not consider such documents in deciding the motion.[3]  To the extent the Court does consider such documents, Plaintiff reserves his right, pursuant to Rule 12, to present evidence in accordance with Rule 56.  *Chambers*, 282 F.3d at 154 (Rule 12's requirements are "'strictly enforced' whenever a district court considers extra-pleading material in ruling on a motion to dismiss.").

## I.      THE SETTLEMENT AGREEMENT IS A BINDING AND ENFORCABLE CONTRACT

Defendants' argument that the Settlement Agreement is not enforceable is without merit. New York law is clear:  "a fully binding preliminary agreement . . . is created when the parties agree on all the points that require negotiations (including whether to be bound) but agree to

---

[3]  Arguments in this Opposition Brief relating to these documents are not intended to waive Callahan's position that they should be excluded but, instead, merely respond to Defendants' arguments about those documents.

7

memorialize their agreement in a more formal document." *Adjustrite Systems, Inc. v. GAB Bus. Svcs., Inc.*, 145 F. 3d 543, 548 (2d Cir. 1998); *see also Teacher's Ins. & Ann. Ass'n v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (courts should "enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation.").

In determining whether an agreement is a "binding preliminary agreement," the "first and most important factor" is the language of the agreement." *Teacher's*, 670 F. Supp. at 499; *see also Adjustrite*, 145 F.3d at 549 ("The first factor, the language of the agreement, is 'the most important.'") (citing *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989)). Defendants' argument *completely ignores* the statement in the Settlement Agreement that "[t]his agreement is binding[.]"  (*See* Moving Br. at 12-15.)  The Settlement Agreement (signed by a third-party witness) also is replete with other language indicating an intent to be bound:  "CSFB agrees to pay," "the parties agree," "the Retention Award[] will be paid," "is fully vested," and "will be provided."  (Compl. ¶ 27.)  The "more formal settlement agreement" is beside the point, because the very definition of a "binding preliminary agreement" assumes that the parties "agree to memorialize their agreement in a more formal document." *Adjustrite*, 145 F. 3d at 548.  "[T]he mere fact that the parties contemplate memorializing their agreement in a more formal document does not prevent their informal agreement from taking effect prior to that event." *B. Lewis Prods., Inc. v. Angelou*, 2003 WL 21709465, at *9 (S.D.N.Y. July 23, 2003), *vacated in part on other grounds and remanded by* 2004 WL 1147071 (2d Cir. May 21, 2004).  The language of the Settlement Agreement clearly establishes a mutual intent to be bound.

Defendants' main argument, that the Settlement Agreement is not binding because it left open questions about Callahan's "status in the PMD," is not only wrong, but it completely

8

mischaracterizes the allegations of the Complaint.  The Settlement Agreement clearly states: "Callahan's status in the PMD will be provided to him."  (Compl. ¶ 27.)  By contrast, Defendants' brief twists this language, paraphrasing liberally:

> [T]he [Settlement Agreement] also noted that "Callahan's Status in the PMD" compensation program had not been resolved at the mediation, but rather "will be provided to him" in the course of further negotiations toward a final "more formal settlement agreement.'"

(Moving Br. at 14.)  The Settlement Agreement says nothing of the sort.  The Complaint alleges that Callahan's "status in the PMD" consisted of an "equity position that Callahan was entitled to in connection with one of the transactions Callahan had worked on for Credit Suisse."  (Compl. ¶ 31.)  The Complaint also alleges that Defendants failed to provide Callahan with that equity position as promised.  (*Id.*)  Neither the Complaint nor the Settlement Agreement itself say that Callahan's PMD equity position "had not been resolved," as Defendants' brief (at 14) contends. A request for delivery of promised consideration does not retroactively change the terms of the agreement regarding that promised consideration.  But that is precisely Defendants' argument — that Callahan's "conduct in negotiating" regarding his agreed-to PMD equity, "evidences his intent *not* to be bound by the [Settlement Agreement]."  (Moving Br. at 14 (emphasis in original).)

While the existence of material open items may be indicative of an intention not to be bound, the Settlement Agreement here simply did not leave any such material terms open.  The 2002 Separation Proposal (Sasser Aff. Ex. 3) definitively undermines Defendants' argument by showing that the "standard" terms of the "more formal settlement agreement" had already been discussed and agreed upon.  There was nothing left to negotiate:  as in *Teacher's,* the phrase "more formal settlement agreement and release, consistent with CSFB's standard settlement agreements," was "understood by both parties as references to" the standard terms that

9

Defendants had previously provided to Callahan in the 2002 Separation Proposal. *Teacher's,* 670 F. Supp. at 501-02. (preliminary agreement was binding despite references to subsequent mortgage without specifying mortgage terms, because they were "understood by both parties as references to the mortgage term sheet" that defendant previously had furnished).[4]

Even if the Settlement Agreement were not a fully "binding preliminary agreement," however, Defendants concede that it is a "binding preliminary commitment." (Moving Br. at 12-15.) *Teacher's* and *Adjustrite*, along with countless other cases, specifically hold that "binding preliminary commitments" are, in fact, enforceable. *Adjustrite*, 145 F.3d at 548; *Teacher's*, 670 F. Supp. at 498. Defendants admit that failure to negotiate in good faith constitutes an actionable breach of such an agreement,[5] and they do not contest that the Complaint alleges Defendants' failure to negotiate in good faith. (*See* Compl. ¶¶ 2-4, 29, 31-32 & 52-58.) Defendants' motion must be denied for this reason alone.

## II.   CALLAHAN'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

Defendants argue that Callahan's Second and Third Claims (each in the alternative, for breach of the Settlement Agreement and breach of the duty of good faith and fair dealing) are barred by New York's six-year statute of limitations. N.Y. C.P.L.R. § 213 (McKinney's 2010). The argument is wholly without merit because Callahan's claims actually accrued within the six-

---

[4] Plaintiff proffers that his response to the 2002 Separation Proposal, prior to execution of the Settlement Agreement, also included, verbatim, all of Defendants' "standard" terms (as did the 2003 Separation Proposal, the 2009 Separation Agreement, and the Attempted Revision, as well as Callahan's response to the 2003 Separation Proposal (Sasser Ex. 6)). Plaintiff will prove this proffer if this motion is converted to a summary judgment motion.

[5] (*See* Moving Br. at 13 ("[T]he parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing.") (citing *Adjustrite*, 145 F. 3d at 548).)

year limitations period and (even if they had not) because, according to New York law,

Defendants' own conduct effected a tolling and/or revival of the statute of limitations.

**A.  _Callahan's Claims Accrued Less Than Six Years Prior to Filing Suit_**

Under New York law, "[a] cause of action for breach of contract usually accrues, and the

limitations period begins to run, upon breach."  _Id._ at 260.  Defendants contort Callahan's

allegations by arguing that the breach alleged is delivery of the 2003 Separation Proposal, which

failed to provide for Callahan's "PMD" equity.  (Moving Br. at 15-16)  But this plainly is not the

case — Callahan has _not_ sued for Defendants' failure to grant his 'PMD status'; indeed, the

Complaint alleges that Callahan agreed to forego his PMD equity if Defendants would finally

make good on their other obligations under the Settlement Agreement.  (Compl. ¶ 32.)

Instead, Callahan's claim for breach of the Settlement Agreement is based on

Defendants' failure to pay the lump-sum agreed to in the Settlement Agreement and their failure

to deliver his previously vested Retention Award stock:

> 48.  The Settlement Agreement obligated Credit Suisse to pay to Callahan
> a lump-sum payment of $735,000, which Credit Suisse has failed and
> refused to pay, thereby breaching the 2003 Settlement Agreement.
>
> 49.  The Settlement Agreement obligated Credit Suisse to pay over to
> Callahan 6,974 shares of Credit Suisse Group common stock, which
> Credit Suisse has failed and refused to pay, thereby breaching the
> Settlement Agreement.

(Compl. ¶ 48-49.)[6]  Paragraphs 33 through 37 of the Complaint describe events surrounding the

2009 Separation Agreement.  Paragraph 38 alleges that "Credit Suisse **_thereafter_** refused to pay

to Callahan both the $735,000 and the 6,974 shares of Credit Suisse Group stock due to him

---

[6]  The Complaint also alleges that the Attempted Revision breached the Separation Agreement and the
duty of good faith and fair dealing.  (Compl. ¶¶ 50, 57.)

under the Settlement Agreement." (Compl. ¶ 38 (emphasis added).) Thus, the claimed breaches occurred during and/or after April 2009 — well within the six-year limitations period.

Defendants' theory also is defeated by the 2003 Settlement Proposal itself, which prominently states, in **BOLD CAPITAL LETTERS** at the top of each of its pages:

**DRAFT 4/9/2003**
**THIS IS <u>NOT</u> AN OFFER – SUBJECT TO INTERNAL APPROVAL**

It is patently unreasonable to view this document as establishing the breach sued upon — by its terms, the document was incapable of acceptance and specifically was not intended as an offer conforming to the Settlement Agreement. Further, the Complaint alleges (and the document itself shows) that the 2003 Settlement Proposal *did*, in fact, provide for payment of the $735,000 lump sum and delivery of the 6,974 shares of Retention Award stock. (Compl. ¶¶ 29-30; *see also* Sasser Aff. Ex. 5, p.2 & 8.) In other words, the 2003 Settlement Proposal was consistent with the obligations that Callahan claims Defendants breached and, therefore, cannot itself have constituted a breach for purposes of accruing Callahan's claims.

Defendants' brief argues that Callahan's claim for breach of the covenant of good faith and fair dealing also accrued "when Credit Suisse proffered the allegedly non-conforming [2003 Separation Proposal]." Defendants' argument fails for the same reasons that it fails on Callahan's breach of contract claim.[7] In addition, however, if a contract requires continuing performance over a period of time, or if the parties contemplate a continuing contractual relationship, each successive breach may begin the statute of limitations running anew. *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007); *Faulkner v. Arista Records LLC*, 602 F. Supp. 2d

---

[7] Defendants do not make limitations arguments specific to the good faith and fair dealing claim, other than to state that it is linked to the breach of contract claim. (*See* Moving Br. at 16 n.16.)

470, 478 (S.D.N.Y. 2009) (citing *Guilbert*); *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 260 (S.D.N.Y. 2008) (same); *Haber v. Gutmann*, 64 A.D.3d 1106, 1108, 882 N.Y.S.2d 780, 782 (3d Dep't 2009).

Defendants had a continuing duty to "among, other things, negotiate in good faith the 'more formal settlement agreement and release' and to do so in a manner consistent with the business terms of the Settlement Agreement." (Compl. ¶ 55; *cf. infra,* n.5) This obligation did not cease merely because Defendants proffered to Callahan a "**DRAFT**" that explicitly was "**NOT AN OFFER**" and was "**SUBJECT TO INTERNAL APPROVAL**." To the contrary, the parties clearly envisioned a continuing relationship, as evidenced by their conduct: Callahan negotiated in good faith and Defendants used "dilatory tactics" over a period of years to "present Callahan with the illusory prospect of getting paid while in reality using delay and bad faith negotiation to force him into submission on point after point." (Compl. ¶ 2; *see also id.* ¶¶ 4, 31-36 & 56-57; *cf. infra* p.4 & *supra* p.17 (describing Defendants' bad faith conduct).) These factual allegations clearly set forth a continuing course of breaches of the duty of good faith and fair dealing over a period of time well within the six-year limitations period.

Putting aside the Complaint's specific allegations of breaches within the limitations period, the Settlement Agreement itself does not otherwise specify a time for performance. In such circumstances, New York law implies a reasonable time for performance. *Flight Sciences, Inc. v. Cathay Pacific Airways Ltd.*, 647 F. Supp. 2d 285, 288 (S.D.N.Y. 2009). Here the allegations sufficiently and plausibly show that, in the context of Callahan's negotiations with Defendants, it was reasonable to allow until June 11, 2004 (six years prior to commencement of this suit) for Defendants to pay the lump sum and deliver the Retention Award stock to Callahan.

13

At worst, however, this is a question of fact not appropriate for resolution on a motion to dismiss. *Id.* at 289 n.3 ("[T]he determination of what is a reasonable time is usually a question of fact.")

### B. *Defendants' Written Affirmations of Their Obligations Preclude the Statute of Limitations from Barring Callahan's Claims*

Defendants' argument that Callahan's claims are barred because the Settlement Proposal was "proffered" more than six years prior to this suit fails independently because Defendants' own subsequent written acknowledgements tolled and/or restarted the applicable limitations period. Section 17-101 of New York General Obligations Law provides as follows:

> An acknowledgment or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract whereby to take an action out of the operation of the provisions of limitations of time for commencing actions under the civil practice law and rules other than an action for the recovery of real property. . . .

N.Y. Gen. Ob. L. § 17-101 (McKinney's 2010). This provision "tolls," "re-starts," and "revives" the statute of limitations for breach of a contractual obligation acknowledged in writing subsequent to execution of the contract. *See*, *e.g.*, *Guilbert*, 480 F. 3d at 149-50; *Faulkner*, 602 F. Supp. 2d at 478. The acknowledgement must be written, signed by the acknowledging party, recognize the existing obligation, and contain nothing inconsistent with an intention to perform the obligation. *Faulkner*, 602 F. Supp. 2d at 478. An effective acknowledgement under § 17-101 may take a variety of forms, but in all cases, "the critical determination is whether the acknowledgement imports an intention to pay." *Id.* at 478-79. The rule applies even if the acknowledgement was made after the original statutory period had run. *United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO v. Great Am. Indus., Inc.*, 479 F. Supp. 216, 227 n.12 (S.D.N.Y. 1979).

In *Faulkner*, the plaintiffs — members of the 1970's rock group, the Bay City Rollers — claimed that their record label, Arista Records, breached their contract by refusing to pay royalties over a twenty-five year period.  602 F. Supp. 2d at 473.  Arista moved to dismiss based on the statue of limitations.  *Id.* at 478.  The Court found that Arista acknowledged its contractual obligation pursuant to § 17-101, including in a letter stating:

> "Arista would be willing to pay the Rollers all accrued royalties and the amount Arista conceded to in connection with the audit, provided Arista receives a correct change of address/payee letter signed by all of the Parties in accordance with the terms of [the] 1981 Agreement. . . . Please understand that this letter is intended to facilitate settlement discussions and is not intended to be a full statement of all the facts and circumstances concerning this matter or a waiver of any of Arista's rights or remedies, all of which are hereby expressly reserved."

*Id.* at 476 (alterations in original).  The Court denied Defendants' motion to dismiss because Arista's acknowledgement tolled the six-year limitations period under § 17-101.  *Id.* at 480-81.  Arista's "reservation of rights" in the acknowledgment did not change the result because it "does nothing to disturb its written acknowledgement that it is willing to pay 'all accrued royalties' to Plaintiffs in accordance with the 1981 Agreement."  *Id.* at 480.  Finally, although any express conditions in a written acknowledgment must be satisfied before application of the toll embodied in § 17-101, *id.* at 479, the Court held that determination of whether the plaintiffs had satisfied the condition of providing updated payee/address information a to be a "fact-intensive inquiry . . . which is inappropriate for resolution [on a motion to dismiss]."  *Id.* at 481 (citations omitted).

Here, Defendants' own submissions reveal several written acknowledgements within the scope of § 17-101.  The 2009 Separation Agreement specifically acknowledges and demonstrates an intention to make good on both of the obligations sued upon here:

> Subject to your execution and the effectiveness of this Separation Agreement and within thirty (30) days of such effectiveness or as soon

> thereafter as practical, Credit Suisse will pay to you a lump sum discretionary payment equal to Seven Hundred Thirty-Five thousand Dollars ($735,000.00) (paid minus applicable taxes and deductions), *pursuant to the handwritten Settlement Agreement between you and Credit Suisse, dated March 6, 2003.*

(Sasser Aff. Ex. 7, p.3 para. 2 (emphasis added).)[8]

> *Pursuant to the terms of your Retention Agreement* with DLJ dated September 27, 2000 . . . [t]he vesting of the July 1, 2002 and the July 1, 2003 tranches of Credit Suisse Group phantom shares (6,984 shares) vested on your Separation Date as the Company terminated your employment without Cause. *You were entitled to the settlement of these Awards within 120 days of your Separation Date.*

(Sasser Aff. Ex. 7, p.10 para. 1 (emphasis added).)

These acknowledgments of the lump sum payment and Retention Award stock obligations effectively tolled and restarted the limitations period pursuant to § 17-101. The acknowledgements are in writing and signed by "George C. Whipple, Managing Director," on behalf of Defendants. The acknowledgments clearly recognize the existing obligations and even refer to them as being "pursuant to the handwritten Settlement Agreement between you and Credit Suisse, dated March 6, 2003" and "[p]ursuant to the terms of your Retention Agreement with DLJ dated September 27, 2000." The acknowledgements affirmatively indicate Defendants' intention to pay and contain nothing inconsistent that intention. The acknowledgments are unconditional, despite the language (with respect to the lump-sum only, not the Retention Award) that payment will be "subject to" execution of the Separation Agreement, because that is part of the original contract being acknowledged (*i.e.*, the Settlement Agreement says the parties will sign a "more formal settlement agreement and release").

---

[8] Defendants made the same acknowledgment in their May 11, 2009 Attempted Revision, *after the date when they now claim the limitations period expired*. (Sasser Aff. Ex. 10, p.2.) Notably, nothing in the May 11 Attempted Revision suggests a limitations bar.

16

Further, Callahan did, in fact, sign the 2009 Separation Agreement — At worst, as in *Faulkner*, whether any such condition has been satisfied is a "fact-intensive inquiry" inappropriate for resolution on a motion to dismiss.  *Faulkner*, 602 F. Supp. 2d at 481.  Accordingly, Defendants' motion to dismiss on limitations grounds should be denied pursuant to § 17-101.

### C.  *Defendants Should be Equitably Estopped from Asserting a Limitations Defense*

The doctrine of equitable estoppel precludes the statute of limitations from barring Callahan's claims here.  "[E]quitable estoppel is applicable where the plaintiff knew of the existence of the cause of action, but the defendant's misconduct caused the plaintiff to delay in bringing suit."  *First Am. Title Ins. Co. v. Fiserve Fulfillment Svcs, Inc.*, 2008 WL 282019, at *5 n.10 (S.D.N.Y. Jan. 25, 2008).  For example, in *Robinson v. Pan Am. World Airways, Inc.*, this Court applied equitable estoppel to preclude a limitations defense to the retaliatory termination claims of a group of employees, based on the employer's conduct during settlement negotiations. 645 F. Supp. 70, 73-74 (S.D.N.Y. 1986) ("*Robinson I*").  Reiterating the Second Circuit's position on equitable estoppel under New York law, the Court stated:

> One factor that frequently appears in the estoppel cases is a settlement negotiation.  Thus, where the defendant assures the plaintiff that he intends to settle, and the plaintiff in reasonable reliance on that assurance, delays bringing his suit until after the limitations period has run, the defendant may be estopped to rely on the limitations defense.

*Id.* at 73 (quoting *Cerbone v. Int'l Ladies' Garment Workers*, 768 F.2d 45, 50 (2d Cir. 1985)).

Here, Defendants similarly "assured" Callahan that they "intended to settle" several times throughout the period they now advance as a limitations bar, *including a mere two days before the expiration of that period.*  They promised to settle in the Settlement Agreement.  (Comp. ¶ 27.)  Then, "under the guise of good faith negotiation," they "embarked on a campaign to disenfranchise Callahan through bad faith conduct and delay."  (Compl. ¶¶ 2-4, 29, 31-32 & 56-

17

57.)  In early 2009, Callahan "relented" and, "in a good faith effort to compromise," agreed to forego his PMD equity "if [Defendants would pay the other compensation agreed to in the Settlement Agreement."  (Compl. ¶ 32.)  "[Defendants] agreed and committed to send Callahan the 'more formal settlement agreement' to conclude the transaction.'"  (*Id.*)  Finally, on April 7, 2009 — *two days before Defendants now claim the limitations period expired* (Moving Br. at 16) — Defendants sent Callahan the 2009 Separation Agreement (Compl. ¶ 33), which specifically acknowledges Defendants' obligations "pursuant to the handwritten Settlement Agreement between [Callahan] and [Defendants]."  (Sasser Aff. Ex. 7, p.3.)  They then waited until the asserted statute of limitations expired and, according to their motion (at 17), thereafter withdrew the 2009 Separation Agreement, effectively placing Callahan's claims beyond the asserted limitations period.  Hence, even accepting Defendants' argument that the breach sued upon here occurred more than six years prior to commencement of this suit, Defendants would be estopped from asserted the statute of limitations as a defense because, as alleged, it was their misconduct that caused Callahan to delay in filing suit.

In all events, whether and to what extent Defendants' conduct caused delay in bringing suit is a fact-specific inquiry inappropriate for resolution on this motion to dismiss.  *Robinson v. Pan Am. World Airways, Inc.*, 650 F. Supp. 125, 127 (S.D.N.Y. 1986) ("*Robinson II*") (noting that equitable estoppel is a "unique" and "highly fact-bound" remedy, and stating: "An equitable estoppel rests largely on the facts and circumstances of the particular case") (internal citation omitted).  Indeed, Defendants' own submission of the October 7, 2003 letter from Callahan's attorney to Defendants' attorney, although not appropriate for consideration on this motion (*see supra* n.3 and accompanying text) describes discussions about, and "CSFB internal documents" concerning, Callahan's "PMD" equity.  (Sasser Aff. Ex. 6, p.3.)  The Complaint alleges that

18

Defendants' engaged in specific bad faith conduct that caused significant delay.  (Compl. ¶¶ 2-4, 29, 31-32 & 56-57.)  Nothing more is required to defeat Defendants motion to dismiss.

## III.   THE COMPLAINT SUFFICIENTLY ALLEGES BREACH OF THE 2009 SEPARATION AGREEMENT

### A.   *The Complaint Alleges that the 2009 Separation Agreement is a Binding Contract*

Defendants' argument that Callahan failed to accept the 2009 Separation Agreement flies in the face of the express allegations of the Complaint.  Defendants argue that Callahan's acceptance came too late because the 2009 Separation Agreement supposedly "was withdrawn both because the 21-day deadline [April 28, 2009] had passed and because Credit Suisse had replaced it with the [Attempted Revision]."  (Moving Br. at 17.)  To the contrary, the Complaint alleges that "[a]fter Callahan had advised Credit Suisse that he was in full agreement with the 2009 Separation Agreement but before it had received Callahan's countersignature on the 2009 Separation Agreement, Credit Suisse sent to Callahan [the Attempted Revision]."  (Compl. ¶ 36.) Even so, as discussed in Point III.B below, Defendants' own submissions illustrate and support Callahan's allegations:  on April 13, 2009, Callahan's "full agreement" with the 2009 Separation Agreement was clearly communicated to Defendants.  (Sasser Aff. Ex. 8.)  Defendants' argument (including any dispute as to the date of Callahan's execution (Moving Br. at 7)) is purely factual, is contradicted by the allegations of the Complaint, which must be taken as true on their face, and is based on collateral documents not referred to or relied upon by the Complaint which, therefore, are precluded from consideration on this motion.

Moreover, the 2009 Separation Agreement itself does not state, as Defendants argue, that it will be deemed "withdrawn" automatically at the end of 21 days.  (Sasser Aff. Ex. 7, pp.3-10.) It does say (at p.8 para. 15) that Callahan will have 21 days "to review and consider it, and to consult with an attorney regarding the terms and effect of this Separation Agreement."  But that

language does not say the 2009 Separation Agreement would be deemed automatically

withdrawn or revoked at the end of that 21-day period.  The 21-day "review" period is not a

deadline for acceptance at all — it is included merely because, without it, according to the Age

Discrimination in Employment Act ("ADEA"), the releases in the 2009 Separation Agreement

would not be considered voluntary and, therefore, would not be enforceable.  29 U.S.C.A. §

626(f)(1)(F)(i).[9]  Similarly, while Defendants argue that the Attempted Revision was a "formal

withdrawal" of the 2009 Separation Agreement, the document itself does not actually say

anything about withdrawing or revoking the 2009 Separation Agreement.  (Sasser Aff. Ex. 10)[10]

### B. *Callahan Accepted, and Did Not Reject, the 2009 Separation Agreement*

Defendants' argument that Callahan rejected the 2009 Separation Agreement is defeated

by the law, the Complaint, and Defendants' own submissions.  Defendants concede the law:

"expressions of assent by an offeree that 'contain *immaterial deviations* from the original offer'

can 'operate to bind the parties to an enforceable contact' without constituting rejections and

counter-offers."  (Moving Br. at 19 (quoting *Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246, 253

(S.D.N.Y. 1997).)  The Complaint alleges that "Callahan advised Credit Suisse that he was in

full agreement with [the 2009 Separation Agreement] and requested confirmation of certain non-

---

[9] "An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary.  [A] waiver may not be considered knowing and voluntary unless at a minimum . . . the individual is given a period of at least 21 days within which to consider the agreement."  29 U.S.C.A. § 626(f)(1)(F)(i).  While § 626 does not mean an offered agreement is irrevocable, if revocation were automatic upon the mere expiration of the 21-day period, an individual could never make a voluntary waiver, because the agreement could be accepted only prior to the expiration of the 21 days, making it impossible to "consider" the agreement for "at least" the full 21-day period.  *Cf. Marks v. New York Univ.*, 61 F. Supp. 2d 81, 89-90 (S.D.N.Y. 1999) (noting that § 626(f)(1)(F)(i) does not create "a twenty-one day option contract").

[10] To the extent Defendants claim in Reply that the supposed withdrawal of the 2009 Separation Agreement was accomplished by some other communication not referenced in and relied upon by the Complaint, it would be inappropriate to consider on this motion.  (*See supra* n.3 and accompanying text.)

substantive matters, such as a typographical error in Exhibit A stating the initial value of

Callahan's Retention Award (*i.e.*, at the time of issuance in 2000) as $5,000 instead of

$500,000."  (Compl. ¶ 34.)  The Complaint's detailed allegations show why this is an

"immaterial deviation":  "this error had no substantive meaning, because the Retention Award

was defined by a *number* of shares, *i.e.*, '6,974 shares,' not by the *value* of those shares at any

given point in time."  (Compl ¶ 34 ("emphasis in original").)  In spite of these allegations,

Defendants label Callahan's handwritten correction a material change that supposedly turned his

"acceptance" into a rejection and counter-offer.  (Compl. ¶¶ 34-35.)

Defendants disingenuously refer to the typographical error as "Callahan's revision of the

value of the Retention Award — from $5,000 to $500,000 . . . ."  (Moving Br. at 20, 21.)  The

argument is disingenuous because it suggests that the reference is to the value of the shares upon

delivery to Callahan when it really, and expressly, refers merely to the "*initial* total value" of the

Retention Award at the time it was awarded in 2000.  (Compl. ¶ 34.)  The Complaint specifically

explains the limited significance of the "initial value" of the Retention Award:

> [T]he Retention Plan provides for participants to receive a retention award
> consisting of a certain number of Phantom Shares which, upon vesting
> would convert into and be paid to the employee, in the form of a
> corresponding number of shares of Credit Suisse Group common stock
> (each such award, a "**Retention Award**").  Participating employees were
> granted Retention Awards of a certain dollar amount, which was translated
> into a certain number of Phantom Shares by dividing the dollar amount by
> the average closing price of Credit Suisse Group shares for the five trading
> days up to and including the closing date of the DLJ Acquisition.

(Compl. ¶ 16).  The Complaint goes on to explain that: (a) the "certain dollar amount" of

Callahan's Retention Award was $500,000, which was converted into 2,619 Phantom Shares

using the formula just described (Compl. ¶ 17); (b) a subsequent "four-way stock split"

quadrupled the number of Callahan's Phantom Shares to a total of 10,476 Phantom Shares

21

(Compl. ¶ 18); and (c) the first "tranche" of Callahan's Retention Award (consisting of one-third of the total number of Phantom Shares) vested on July 1, 2001, so that "[t]he balance of Callahan's Retention Award thereafter consisted of 6,984 Phantom Shares." (Compl. ¶ 19.) The value of Callahan's vested Retention Award stock at the time of the 2009 Separation Agreement was the product of the "6,974 shares" and the then-current market price of the publicly traded Credit Suisse Group stock — *i.e.*, once the number of shares was established (in 2000), the "initial total value" of the Retention Award became irrelevant and immaterial. And, of course, the 2009 Separation Agreement itself correctly identifies the applicable number of shares as "6,974 shares." (Compl. ¶ 33; Sasser Aff. Ex. 7, p.10.)

Defendants' own submissions also establish that Callahan's handwritten correction was immaterial and, therefore, did not affect the validity of Callahan's acceptance. For example, the purported September 27, 2000 employment contract states, "[y]ou will receive a Retention Award in the amount of $500,000 . . . ." (Sasser Aff. Ex. 1, p.1.) Exhibit A of that contract (at para. B) describes the formula for converting that dollar amount into a number of Phantom Shares just as it is described in the Complaint (at ¶ 16), as does Defendants' April 3, 2001 letter to Callahan (Sasser Aff. Ex. 2), including the actual mathematical calculations.

Similarly, that an acceptance is "accompanied with a direction or a request looking to the carrying out of its provisions, but which does not limit or restrict the contract, does not render it ineffectual or give it the character of a counteroffer." *Krumme v. Westpoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) (quoting *Valashinas v. Koniuto*, 283 A.D. 13, 17, 125 N.Y.S.2d 554, 558 (3d Dep't 1953), *aff'd*, 308 N.Y. 233, 124 N.E.2d 300 (1954)). In *Krumme*, an employer had offered to its employees an amendment to an employee benefit plan that would allow the employees to obtain a lump-sum payment based on certain actuarial and interest rate

assumptions.  143 F.3d at 74-75.  The Second Circuit held that a cover letter accompanying acceptance of the contract, but requesting confirmation that the applicable rate of interest was something other than that stated in the contract, did not preclude formation of a contract.  *Id.* at 83-84.  Similarly, in *Valashinas*, the parties had exchanged letters implementing certain dissolution and buy-out provisions of their prior partnership agreement.  283 A.D. at 14-16; 125 N.Y.S.2d at 556-57.  The court held that one party's inclusion, in a purported acceptance, of a new provision fixing a closing date consistent with the prior partnership agreement did not preclude formation of a contract.  *Id.* at 17-18, 125 N.Y.S.2d at 558-59.

The April 13, 2009 letter communicating Callahan's agreement states: "Mr. Callahan is in full agreement with the body of the letter; however he asked two or three questions regarding Exhibit A."  (Sasser Aff. Ex. 8)  Defendants' argument fails to note that Callahan's "questions" were limited to "Exhibit A" of the 2009 Separation Agreement as opposed to the agreement itself, and the questions themselves simply sought confirmation of factual matters that do not change the terms or substantive meaning of the 2009 Agreement, such as correction of the typographical error, confirmation of the correct number of credited years of service for pension purposes, and clarification that the lump-sum and Retention Award were separate items, as previously agreed in the original Settlement Agreement.  Instead, this was merely a "request looking to the carrying out of [the contract's] provisions, but which does not limit or restrict the contract" and, therefore, "does not render [Plaintiff's acceptance] ineffectual or give it the character of a counteroffer."  *Krumme*, 143 F.3d at 83.

Defendants' convoluted argument about the materiality of Callahan's correction of the typographical error in the 2009 Separation Agreement simply makes no sense.  Defendants assert, based on a collateral document not referenced or relied on in the Complaint (Sasser

Ex. 6), that Callahan "voluntarily resigned" rather than being "terminated without Cause," thereby forfeiting his Retention Award, and suggest that this somehow makes Callahan's correction of the non-substantive typographical error a material change.  (Moving Br. at 21-22.) But the Complaint clearly alleges that Callahan was terminated without cause and that Defendants acknowledged the same in writing on several occasions (including in the 2009 Separation Agreement itself (*see* Sasser Aff. Ex. 7, p.9)).[11]  The 2009 Separation Agreement, drafted by Defendants, does not say that Callahan "voluntarily resigned."  Whether Callahan at some point said that he "retired" is irrelevant to whether the 2009 Settlement Agreement is a binding contract.[12]  Finally, in the most perplexing twist of Defendants' argument, Defendants' next document — the Attempted Revision — *actually accepted Callahan's correction of the typographical error*:  "Pursuant to the terms of your Retention Agreement with DLJ dated September 27, 2000, you were granted a Retention Award with an initial total value of $500,000."  (Sasser Aff. Ex. 10, p. 9.)  In all events, "whether [Plaintiff] was terminated or resigned unilaterally is a factual dispute that is not appropriate for resolution on this motion to dismiss."  *Liddle & Robinson, LLP v. Garrett*, 2010 WL 2628656, at *5 (S.D.N.Y. July 1, 2010).

---

[11] (*See*, *e.g.*, Compl. ¶ 1 ("Credit Suisse terminated Callahan's employment without cause."), ¶ 21 ("The termination of Callahan's employment was 'without cause,' within the meaning of the Retention Plan."), ¶ 23 ("Exhibit A of the 2002 Separation Proposal stated . . . the Company has terminated your employment without Cause"), & ¶ 28 (alleging that the Settlement Agreement "specifically refers to, and thereby incorporates by reference, Exhibit A of the 2002 Settlement Proposal," which stated that Callahan had been terminated without cause).)

[12]  It is hardly remarkable for a senior executive fired without cause, out of embarrassment or to 'save face,' to express a desire to label his termination as retirement rather than termination.  Plaintiff proffers that this is precisely the explanation for any references in 2003 to retirement as opposed to termination without cause.  Ultimately, because the contracts sued upon say "terminated without cause," the distinction is irrelevant; however, Callahan reserves the right to present proof of these matters at trial or, if the Court converts this motion to one for summary judgment, in opposition to that converted motion.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff respectfully requests that Defendants' motion to dismiss be denied.  In the alternative, to the extent that Defendants' motion is granted, Plaintiff respectfully requests leave to amend the Complaint accordingly pursuant to F.R.C.P. 15(a).

Dated: August 20, 2010
      New York, NY

ALL COUNSEL P.C.

By:    Andrew L. Lee (AL-3765)
       405 Lexington Ave. Fl. 26
       New York, NY 10174
       (212) 541-2429
       alee@ALL-Counsel.com
       *Counsel for Plaintiff Patrick J. Callahan, Jr*

25