# Exhibit 2

**ALL Counsel P.C.**
By: Andrew L. Lee (AL-3765)
680 Fifth Ave. Fl. 5
New York, NY 10019
(212) 541-2429
alee@ALL-Counsel.com
*Counsel for Plaintiff Patrick J. Callahan, Jr.*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICK J. CALLAHAN, JR.

                        Plaintiff,

        v.

CREDIT SUISSE (USA), INC., CREDIT SUISSE
GROUP AG, CREDIT SUISSE SECURITIES
(USA) LLC, and CREDIT SUISSE FIRST
BOSTON CORPORATION,

                        Defendants.

**AMENDED COMPLAINT**

Civ. No.: 10 Civ. 4599 (BSJ) (JLC)

*Trial by Jury Demanded*

        Plaintiff Patrick J. Callahan, Jr. (**"Callahan"**), by and through his counsel of record,

Andrew L. Lee of ALL Counsel P.C., alleges, as and for his Complaint against Defendants

Credit Suisse (USA), Inc., Credit Suisse Group AG, Credit Suisse Securities (USA) LLC, and

Credit Suisse First Boston Corporation, as follows:

## INTRODUCTION

        1.      Plaintiff Callahan brings this action against his former employer and related

entities, Credit Suisse (USA), Inc., Credit Suisse Group AG, Credit Suisse Securities (USA)

LLC, and Credit Suisse First Boston Corporation, for breach of contract and breach of the duty

of good faith and fair dealing.  In 2000, after Credit Suisse acquired Donaldson, Lufkin &

Jenrette (Callahan's then-current employer), it retained Callahan as a managing director, offered

him a salary and bonus commensurate with his role in the combined organization and issued to

him a "Retention Award" consisting of $500,000 of Credit Suisse Group stock. A year later, however, Credit Suisse terminated Callahan's employment without cause.

2.      Rather than pay Callahan what the terms of his employment entitled him to, Credit Suisse, under the guise of good faith negotiation, embarked on a campaign to disenfranchise Callahan through bad faith conduct, delay, misrepresentation and deception. First, Credit Suisse made Callahan pursue his claim through its three-stage corporate dispute resolution program. Callahan obliged, in good faith. The result was Credit Suisse's written, signed, and expressly "binding" agreement to provide a specified separation package to Callahan, which included a $735,000 lump sum payment and Credit Suisse's confirmation of the balance of Callahan's previously vested $500,000 Retention Award. Callahan accepted that resolution (again, acting in good faith).

3.      Then, Credit Suisse waged a campaign of bad faith delay and misrepresentations in an effort to deprive Callahan of the benefit of the bargain of that binding settlement agreement. Nonetheless, Callahan cooperated in Credit Suisse's process and sought to negotiate those agreements in good faith.

4.      Eventually, Callahan succumbed to Credit Suisse's dilatory and deceptive tactics and, in a good faith effort to obtain closure, accepted and signed the package that Credit Suisse was willing to provide. After that, however, Credit Suisse once again changed the deal by claiming Callahan had rejected the package, and reduced it further by purporting to take away the remainder of Callahan's fully vested Retention Award while continuing to acknowledge its obligation to make the $735,000 lump sum payment.

5.      By that time, it finally became clear that Credit Suisse's secret intent all along was to present Callahan with the illusory prospect of getting paid while in reality using delay,

2

deception, and bad faith negotiation to force him into submission on point after point. This time, rather than bow to Credit Suisse's strong-arming, Callahan resolved to enforce his rights through this action. Credit Suisse agreed to pay Callahan $735,000 in separation pay and the remaining two-thirds of his Retention Award. To date, they have paid him nothing. This action seeks to recover those amounts (now worth more than $1.1 million, conservatively) for breach of the two separate agreements in which Credit Suisse agreed to these payments, as well as for Credit Suisse's bad faith and unfair treatment of Callahan at all relevant times.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C.A. § 1332(a).

7.      Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(a) because the Defendants reside in this District and because a substantial part of the events and/or omissions upon which Plaintiff's claims are based occurred within this District.

## PARTIES

8.      Plaintiff Callahan is an individual residing in Cook County, Illinois. Callahan formerly was an employee of one or all of the Defendants.

9.      Upon information and belief, Defendant Credit Suisse (USA), Inc. ("**Credit Suisse Inc.**") is a Delaware corporation in the financial services industry with its principal place of business in New York, NY. Credit Suisse Inc. is a subsidiary of Defendant Credit Suisse Group. Prior corporate names of Credit Suisse Inc. have included Credit Suisse First Boston (USA), Inc. and Donaldson, Lufkin & Jenrette, Inc.

3

10.     Upon information and belief, Defendant Credit Suisse Group AG ("**Credit Suisse Group**") is a Swiss Corporation in the financial services industry with its principal place of business in Switzerland and with regional headquarters in New York, NY.  Credit Suisse Group is a publicly traded company that regularly conducts substantial business activities within New York State.  Credit Suisse Group is the parent company of Defendants Credit Suisse Inc., Credit Suisse LLC and CSFB Corporation and is also the issuer of the stock making up the Retention Award that lies at the heart of this dispute.

11.     Upon information and belief, Credit Suisse Securities (USA) LLC ("**Credit Suisse LLC**") is a Delaware limited liability company in the financial services industry with its principal place of business in New York, NY.  Credit Suisse LLC is a subsidiary of Defendant Credit Suisse Group.  Prior corporate names of Credit Suisse LLC have included Credit Suisse First Boston LLC.

12.     Upon information and belief, Credit Suisse First Boston Corporation ("**CSFB Corporation**") is a Massachusetts corporation in the financial services industry with its principal place of business in New York, NY.  CSFB Corporation is a subsidiary of Defendant Credit Suisse Group.  Prior corporate names of CSFB Corporation have included Credit Suisse First Boston Corporation, CS First Boston Corporation, The First Boston Corporation, and the First of Boston Corporation.

13.     Upon information and belief, for purposes of Plaintiff's claims, the Defendants are the alter egos of one another because they are under common ownership and/or control and, at least with respect to the acts and/or omissions upon which Plaintiff's claims are based, such common owners and/or controlling persons have exercised complete domination over the Defendants' businesses and have used them interchangeably with no regard for their separate

corporate identities, all in a manner that obfuscated their separate identities in their dealings with

Plaintiff. (Defendants Credit Suisse Inc., Credit Suisse Group, Credit Suisse LLC, and CSFB

Corporation are collectively referred to herein as "**Defendants**" or "**Credit Suisse**".)

## **FACTUAL BACKGROUND**

### *Credit Suisse Group Acquires DLJ and Issues the Retention Plan*

14.     In the Spring of 2000, after working as an investment banker for nearly thirty

years, Callahan became employed by Donaldson Lufkin & Jenrette ("**DLJ**") as a Managing

Director and co-head of DLJ's Chicago Investment Banking Group, with compensation of more

than $1,650,000, along with other considerations and benefits.

15.     Upon information and belief, on or about August 30, 2000, Credit Suisse Group

and DLJ announced an agreement to combine their businesses via Credit Suisse's acquisition of

DLJ in exchange for $11.5 billion, or $90 per DLJ share.

16.     Upon information and belief, on or about November 3, 2000, Credit Suisse and

DLJ closed the acquisition (the "**DLJ Acquisition**") and renamed the surviving company Credit

Suisse First Boston (USA), Inc., which subsequently changed its name to become Defendant

Credit Suisse Inc. The terms of the transaction required Credit Suisse to establish a retention

pool valued at $1.2 billion in the aggregate, consisting of phantom shares relating to Credit

Suisse Group common stock (the "**Phantom Shares**"). Credit Suisse established this pool as

part of the Credit Suisse Group International Share Plan (the "**Retention Plan**").

17.     Upon information and belief, the Retention Plan provides for participants to

receive a retention award consisting of a certain number of Phantom Shares which, upon vesting,

would convert into and be paid to the employee, in the form of a corresponding number of shares

of Credit Suisse Group common stock (each such award, a "**Retention Award**").  Participating

employees were granted Retention Awards of a certain dollar amount, which was translated into

a certain number of Phantom Shares by dividing the dollar amount by the average closing price

of Credit Suisse Group shares for the five trading days up to and including the closing date of the

DLJ Acquisition.  The Retention Plan provided for Retention Awards to vest in three equal

installments on each of July 1, 2001, July 1, 2002, and July 1, 2003, subject to acceleration of

vesting of a Retention Award upon certain events, including Credit Suisse's termination without

cause of a participant's employment.

18.     Plaintiff Callahan was a participant in the Retention Plan and was granted a

Retention Award of $500,000, consisting of 2,619 Phantom Shares.

19.     On or about June 1, 2001, Defendants announced an alteration to the capital

structure of Credit Suisse Group, consisting of a four-way stock split.  As a result, Retention

Award Phantom Shares also were split four ways, so that Callahan's Retention Award then

consisted of 10,476 Phantom Shares, corresponding to 10,476 actual shares of Credit Suisse

Group common stock.

20.     The first tranche of Callahan's Retention Award vested on July 1, 2001, resulting

in 3,492 of Callahan's Phantom Shares converting into 3,492 shares of Credit Suisse Group

common stock, paid and issued to Callahan.  The balance of Callahan's Retention Award

thereafter consisted of 6,984 Phantom Shares.

*Callahan's Employment After the DLJ Acquisition*

21.     In or around February 2001, Credit Suisse named Callahan Managing Director-

Special Advisor of the Investment Banking Division.  The terms of Callahan's employment as

6

Managing Director-Special Advisor provided a base salary, a bonus pursuant to the DLJ Long Term Incentive Plan, an additional incentive bonus based upon Callahan's performance and contribution to Credit Suisse's profitability, as well as eligibility for all employee benefit plans and full post-retirement medical benefits. These employment terms had no effect on Callahan's pre-existing rights under the Retention Plan.

22.     Throughout 2001, Callahan was involved in and made significant contributions to various transactions that yielded substantial benefits to Credit Suisse. Nonetheless, in December 2001, Credit Suisse notified Callahan that his employment with Credit Suisse would terminate as of December 31, 2001. Although Callahan, who was then 59 years old, suggested that he might want to publicly describe his departure from Credit Suisse as "retirement," in reality he was terminated by Credit Suisse. The termination of Callahan's employment was "without cause," within the meaning of the Retention Plan.

23.     One of the transactions that Callahan worked on prior to his termination without cause was DLJ's (and then Credit Suisse's) acquisition of a business known as "PMD." Callahan had, for many years, maintained close personal and professional relationships with management at BF Goodrich and Callahan had advised BF Goodrich with respect to various transactions and potential transactions over the years. In the months leading up to and shortly after Credit Suisse's acquisition of DLJ, Callahan performed a significant role for DLJ and Credit Suisse with respect to Credit Suisse's acquisition of BF Goodrich's specialty chemicals business unit known as "PMD."

*Callahan's Separation from Credit Suisse*

24.    On or about January 14, 2002, Credit Suisse offered Callahan a Separation

Package consisting of a lump sum payment of a bonus for 2001 and also confirming Callahan's

rights with respect to various benefits, including the full vesting of his Retention Award, the full

vesting of his allocation in an incentive plan known as the "DLJ/LBO Incentive Plan," his total

vested balance under the 401(k) Plan, his benefits under the Pension Plan, and other things like

continued health and medical coverage (the "**2002 Separation Proposal**").  The 2002 Separation

Proposal was delivered in the form of a "Separation Agreement," which included various

releases and covenants designed to waive Callahan's rights to pursue claims against Credit

Suisse.

25.    Among other things, the 2002 Separation Proposal confirmed that the balance of

Callahan's Retention Award had fully vested as a result of the termination of his employment

without cause.  Specifically, Exhibit A of the 2002 Separation Proposal stated:

> The vesting of the July 1, 2002 and the July 1, 2003 tranches of
> Credit Suisse Group phantom shares (6,984 shares) will vest on
> your Separation Date [defined as December 31, 2001] as the
> Company has terminated your employment without Cause.  You
> will be entitled to the settlement of these Awards within 120 days
> of your Separation Date.

26.    Believing that his contributions to various transactions during 2001 entitled him

to a considerably larger bonus for 2001 than Credit Suisse had offered in the 2002 Separation

Proposal, Callahan declined the 2002 Separation Proposal and, following Credit Suisse's

"internal grievance procedures," initiated an internal grievance to address his post-separation

compensation.

8

27.     Credit Suisse refused to increase its offer from the 2002 Separation Proposal and, instead, referred Callahan to Credit Suisse's "Dispute Resolution Program." In a letter dated July 19, 2002, George C. Whipple III, Esq. (an in-house lawyer and Managing Director of Credit Suisse) wrote to Callahan's attorney:

> Please find enclosed a copy of Credit Suisse First Boston's Employment Dispute Resolution Program (the "Program") and accompanying Request for Mediation form.
>
> The Program, which is a three-step process of dispute resolution procedures, provides that these procedures are the exclusive means by which an employee is able to seek resolution of his/her employment related dispute. The three components of the Program are internal grievance processing, mediation and arbitration. The three steps must be taken in sequence. As you have already completed the first step of this process, we should now proceed to mediation.

## *Mediation Results in the March 6, 2003 Settlement Agreement*

28.     On or about September 9, 2002, Callahan submitted his formal Request for Mediation. Pursuant to the Credit Suisse Dispute Resolution Program, mediation was initiated through JAMS, an independent provider of dispute resolution services.

29.     On or about March 6, 2003, a formal mediation was held before the JAMS-appointed mediator, Roger J. Ziman, Esq. The result of the mediation was a handwritten settlement agreement, signed by Callahan and by Peggy Campbell on behalf of Credit Suisse, and signed by Mediator Roger J. Ziman, Esq. as a witness (the "**2003 Settlement Agreement**"). The 2003 Settlement Agreement provides, in its entirety, as follows:

> *In the Matter of Callahan v. CSFB, LLC*
>
> *(1) CSFB agrees to pay Callahan the sum of $735,000 in total settlement of all claims by Callahan against CSFB from his prior employment;*

9

> (2) *This agreement is binding and the parties agree to execute a more formal settlement agreement and release, consistent with CSFB's standard settlement agreements;*
>
> (3) *With regard to Exhibit A of CSFB's Separation Agreement of Jan 14, 2002*
>
> *item 1, the Retention Award, will be paid separate & apart from the total sum referred to above;*
>
> *item #2, Callahan's participation in the DLJ LBO incentive plan is fully vested[.]*
>
> *item #3, the Car has been purchased by Callahan;*
>
> *#4, [sic] Callahan's status in the PMD will be provided to him.*

30.    Paragraph "(3)" of the 2003 Settlement Agreement specifically refers to, and thereby incorporates by reference, Exhibit A of the 2002 Separation Proposal, including its confirmation that the second and third tranches of Callahan's Retention Award (consisting of "6,984 shares" of Credit Suisse Group shares) had vested as of December 31, 2001.

31.    The reference in the 2003 Settlement Agreement to Callahan's "status in the PMD" referred to Credit Suisse's agreement to provide Callahan with information sufficient for Callahan to determine whether his name had been recommended for inclusion in the group of persons eligible to invest their own money into the PMD acquisition as equity investors. Specifically, Credit Suisse formed a new entity to acquire the PMD business and Credit Suisse management had given permission to certain persons who had worked on the transaction to invest in that new entity (the "PMD Entity"). The reference to Callahan's "status in the PMD" did not require Credit Suisse to pay any compensation to Callahan; instead, it merely referred to the provision of information sufficient for Callahan to determine whether he had been recommended as someone who should be included in the group of persons offered the

opportunity to invest in the PMD Entity. At the time of the mediation, Credit Suisse had already

finalized its list of PMD Investors and Callahan was not on that list (the "PMD List"), but

nonetheless negotiated Credit Suisse's agreement to provide information sufficient for Callahan

to determine whether his name had been recommended for inclusion on the PMD List (*i.e.*,

Callahan's "**status in the PMD**").

### *Negotiation of the "More Formal Agreement" and Callahan's Status in the PMD*

32.     On or about April 9, 2003, Credit Suisse sent to Callahan's counsel a proposed

Separation Agreement (the "**2003 Separation Proposal**") which, according to the cover letter

accompanying the document, "sets out the terms of our agreement as discussed at mediation on

March 6, 2003." The 2003 Separation Proposal provided for the $735,000 lump sum payment

and the other consideration promised to Callahan in the 2003 Settlement Agreement, but did not

address Callahan's "status in the PMD," referenced in paragraph "#4" of the 2003 Settlement

Agreement. The 2003 Separation Proposal prominently states, in **BOLD CAPITAL LETTERS**

at the top of each of its pages:

**DRAFT 4/9/2003**
**THIS IS <u>NOT</u> AN OFFER – SUBJECT TO INTERNAL APPROVAL**

33.     Exhibit A to the 2003 Separation Proposal once again confirms that the second

and third tranches of Callahan's Retention Award, consisting of "6,984 shares," had vested as of

December 31, 2001 because Callahan's employment had been terminated without cause.

34.     The 2003 Separation Proposal did not include any information about Callahan's

"status in the PMD." Believing that Credit Suisse had opted to provide that information under

separate cover, Callahan began his own inquiry. Over the summer of 2003, Callahan inquired

with Susan C. Schnabel, Managing Director of Credit Suisse, who told Callahan that she had, in

a memo to Credit Suisse management, recommended that Callahan should be included among

the persons offered the opportunity to invest in the PMD Entity.  During that same time period,

Callahan also inquired of Peter T. Grauer (a former Managing Director of DLJ and Credit Suisse,

who had by then moved on to other employment).  Mr. Grauer similarly stated that Callahan had

been recommended for inclusion among the persons offered the opportunity to invest in the PMD

Entity.  Accordingly, Callahan instructed his counsel to inquire with Credit Suisse's counsel

about his status in the PMD.

35.     The Credit Suisse attorney who had sent the 2003 Separation Proposal to

Callahan's counsel had, by then, left the firm that was representing Credit Suisse.  Callahan's

counsel, therefore, wrote to another attorney at that firm, Ms. Anita Raman, on October 14, 2003,

to inquire whom he should correspond with about the 2003 Separation Proposal and Callahan's

status in the PMD.  Callahan's counsel communicated Callahan's requests for changes to the

2003 Separation Proposal (none of which referred to the PMD issue), advised that Ms. Schnabel

and Mr. Grauer had told Callahan that his name had been recommended for inclusion among the

persons offered the opportunity to invest in the PMD Entity, and requested confirmation from

Credit Suisse management of that "status in the PMD."

36.     The October 14 letter from Callahan's counsel also requested correction of the

number of years of service attributed to Callahan in the 2003 Settlement Proposal, for purposes

of Credit Suisse's pension plan.  The 2003 Separation Proposal indicated the number of years

was eight, whereas Callahan believed the correct number of years was nine.

37.     Several weeks passed with no response from Ms. Raman or anyone else at her

firm or at Credit Suisse.  Callahan's counsel wrote to Ms. Raman again on December 3, 2003,

requesting a response to his prior letter. Ms. Raman finally got in touch with Callahan's counsel by telephone on December 9, 2003. Contrary to Ms. Schnabel's and Mr. Grauer's representations to Callahan, Ms. Raman implied that Callahan's name had not been recommended for inclusion among the persons offered the opportunity to invest in the PMD Entity. Either Ms. Raman's representation or the representations from Ms. Schnabel and Mr. Grauer were false and, upon information and belief, Credit Suisse had actual or constructive knowledge of that falsity.

38.     The next day, December 10, 2003, Callahan's counsel wrote to Ms. Raman again, requesting Callahan's status in the PMD and also providing additional information about Callahan's years of service for pension purposes.

39.     On December 15, 2003, Ms. Raman responded in writing to Callahan's attorney for the first time. Her letter stated that Callahan was not entitled to "any monies" from the PMD transaction. Callahan's counsel responded on December 19, 2003, explaining again that Callahan was not seeking any money in connection with the PMD transaction but was merely seeking information about whether Callahan's name had been recommended for inclusion among the persons offered the opportunity to invest in the PMD Entity. Callahan's attorney summed up as follows: "Unfortunately, this rather tangential issue is holding up the ability of the parties to document the agreement reached on the core issues. If Mr. Callahan can determine whether he was identified as a potential investor in the PMD/Noveon Project, I believe we can move forward and resolve all of the other issues." Several more weeks passed before Callahan's counsel received any response.

40.     Finally, in early February 2004, Ms. Raman and Callahan's counsel had a telephone conversation during which Ms. Raman that expressed Ms. Schnabel did not recall

telling Callahan that he had been included among the persons offered the opportunity to invest in the PMD Entity. Callahan's counsel requested that Ms. Raman provide documentation regarding Callahan's status in the PMD, specifically including whether Callahan was *recommended* to be included among the persons offered the opportunity to invest in the PMD Entity.

41.    Rather than provide the requested documentation, Ms. Raman wrote to Callahan's counsel, on February 5, 2004, that "based on my telephone conversations with Ms. Schnabel and others at Credit Suisse, no one there recalls telling Mr. Callahan that he was listed to participate as an equity investor in the PMD/Noveon program." Ms. Raman's letter continued to answer the wrong question, as Callahan's status in the PMD was not about whether he was actually on the list of persons offered the opportunity to invest in the PMD Entity — it was already known at the 2003 mediation that Credit Suisse had not included Callahan on that list. Instead, pursuant to the 2003 Settlement Agreement and consistent with Ms. Schanbel's prior representation, Callahan was seeking documentation of whether he had been recommended to be included among the persons offered the opportunity to invest in the PMD Entity. Credit Suisse's failure to provide the documentation Callahan had requested was false and misleading by omission and, upon information and belief, Credit Suisse had actual or constructive knowledge of this false and misleading omission.

42.    Callahan's counsel responded to Ms. Raman on February 6, 2004, explaining that his request was for documentation of whether Callahan had been recommended for inclusion among the persons offered the opportunity to invest in the PMD Entity, rather than simply a representation from Credit Suisse's counsel to the effect that Credit Suisse did not remember telling Callahan that he had actually been included in the list of such persons. Callahan's counsel reiterated that Callahan was "asking whether Ms. Schnabel or Mr. Grauer recommended

[Callahan] to be put on the list. He believes that that was one of their functions and wants to know whether they, or either of them[,] did in fact recommend to management that he be considered as an investor."

43.     On February 11, 2004, Ms. Raman responded to Callahan's counsel, claiming that Credit Suisse's delay in providing Callahan with his status in the PMD was due to her belief that "your office has not clearly communicated to us Mr. Callahan's position with respect to the PMD/Noveon Program." Ms. Raman continued, "[t]hat notwithstanding, I can confirm for you that no one at Credit Suisse, including Ms. Schnabel or Mr. Grauer, recommended that Mr. Callahan be put on the list to participate as an equity investor in the PMD/Noveon Program."

44.     Ms. Raman concluded her letter by finally acknowledging, after nearly four months, that Callahan was entitled to credit for nine, rather than eight, years of service for pension purposes. Notably, Ms. Raman did not provide any documentation, other than her representation, of Callahan's status in the PMD. Either Ms. Raman's representation in this letter or the prior representations of Ms. Schnabel were false, misleading and deceptive (they are diametrically opposed and, therefore, cannot both be true) and, upon information and belief, Credit Suisse had actual or constructive knowledge of that falsity. In addition, Credit Suisse's failure to provide the documentation Callahan had requested was false and misleading by omission and, upon information and belief, Credit Suisse had actual or constructive knowledge of this false and misleading omission.

45.     Recognizing that his status in the PMD had been misrepresented to him, either by Credit Suisse's Managing Director Susan Schnabel (who said he had been recommended for inclusion among the persons offered the opportunity to invest in the PMD Entity) or by Credit Suisse's attorney (who said he had not been so recommended), Callahan continued to seek

15

documentation of his status in the PMD. Between February 11, 2004 and April 14, 2004, Callahan again discussed his status in the PMD directly with Ms. Schnabel and Mr. Grauer. Mr. Grauer confirmed that Ms. Schnabel had been the person responsible for submitting the PMD List to Credit Suisse management. Ms. Schnabel, for her part, confirmed that she had sent a memo to Tony James, Credit Suisse's head of Investment Banking, recommending the names of employees that Credit Suisse should include among the persons offered the opportunity to invest in the PMD Entity. Ms. Schnabel claimed that she no longer had a copy of this memo, as a result could not definitively provide that list of names, and instructed Callahan to contact Credit Suisse's New York offices to request copies of the relevant documents. In light of the falsity of either Ms. Raman's representation or the prior representations of Ms. Schnabel and Mr. Grauer, Credit Suisse's failure to provide the documentation Callahan had requested was false and misleading by omission and, upon information and belief, Credit Suisse had actual or constructive knowledge of this false and misleading omission.

46.     On April 14, 2003, Callahan wrote to Adebayo Ogunlesi, the new head of Credit Suisse's investment banking group, to inform him that Callahan had received differing and conflicting representations from Credit Suisse representatives about his status in the PMD, that those representatives had failed to provide any documentation of his status in the PMD, and to inquire about production of those documents. In light of the falsity of either Ms. Raman's representation or the prior representations of Ms. Schnabel and Mr. Grauer, Credit Suisse's failure to provide the documentation Callahan had requested was false and misleading by omission and, upon information and belief, Credit Suisse had actual or constructive knowledge of this false and misleading omission.

47.    On April 22, 2004, Callahan's counsel wrote to Ms. Raman again, explaining that

Callahan's status in the PMD "remains unresolved." Callahan's counsel explained that Callahan

had had extensive conversations with Ms. Schnabel and Mr. Grauer and that Callahan believed

that "the normal course of CSFB business policies" should have dictated that he be considered

for the opportunity to invest in the PMD Entity and that Callahan believed "that his treatment at

CSFB in 2001 was, perhaps[,] motivated by a desire to prevent him from participating in the

profit of the transaction he created." Callahan's counsel concluded by asking again for

documentation of Callahan's status in the PMD (such as Ms. Schnabel's memo) and advised that

Callahan intended to ask the same question directly of Mr. Ogunlesi.

48.    Upon information and belief, Ms. Raman never responded to the April 22, 2004

letter. Either Ms. Raman's representation or the prior representations of Ms. Schnabel were

false, deceptive and misleading, and Credit Suisse's failure to provide the documentation

Callahan had requested was false, deceptive, and misleading by omission. Upon information and

belief, Credit Suisse had actual or constructive knowledge of these false, deceptive and

misleading statements and omissions.

49.    Callahan then sought to follow up directly with Mr. Ogunlesi. During the late

spring or early summer of 2004, Callahan met with Mr. Ogunlesi and inquired further about

documentation regarding his status in the PMD, which remained at that point the subject of

conflicting representations from Credit Suisse. Mr. Ogunlesi told Callahan, in substance, that he

would look into it and get back to him. Neither Mr. Ogunlesi nor anyone else from Credit Suisse

ever responded to Callahan's renewed request. In light of the falsity of either Ms. Raman's

representation or the prior representations of Ms. Schnabel and Mr. Grauer, Credit Suisse's

failure to provide the documentation Callahan had requested was false, deceptive and misleading

17

by omission and, upon information and belief, Credit Suisse had actual or constructive knowledge of this false and misleading omission.

50.     During the ensuing months, Callahan awaited Credit Suisse's response to his request for documentation of his status in the PMD, but no response came. Faced with Credit Suisse's obvious and blatant misrepresentations about his status in the PMD and obstinate and unwarranted refusal to provide any documentation about that status, Callahan periodically but regularly continued his inquiry to resolve the contradictory messages he had received from Credit Suisse. For example, over the summer of 2004, Callahan met with Steven Koch of Credit Suisse's mergers and acquisitions group to inquire about Credit Suisse's refusal to provide the requested documentation, but that meeting did not result in any documentation being provided. In light of the falsity of either Ms. Raman's representation or the prior representations of Ms. Schnabel and Mr. Grauer, Credit Suisse's failure to provide the documentation Callahan had requested was false and misleading by omission and, upon information and belief, Credit Suisse had actual or constructive knowledge of this false and misleading omission.

51.     Similarly, in December 2004, Callahan met with Tony James, who had been the head of Credit Suisse's investment banking group when Ms. Schnabel had submitted the PMD List. Mr. James confirmed the existence of the memo that Ms. Schnabel had submitted to him recommending names for inclusion among the persons offered the opportunity to invest in the PMD Entity but did not have a copy and, therefore, could not confirm whether Callahan had been recommended for inclusion among that group of people.

52.     In December 2006, Callahan's counsel wrote to Michael Carlinsky, the attorney who had represented Credit Suisse in the 2003 mediation, to "request a forum in which to review the . . . requested information relating to the PMD/NOVEON investment" in an effort to

conclude a formal settlement agreement. Upon information and belief, Mr. Carlinsky did not respond to this request. In light of the falsity of either Ms. Raman's representation or the prior representations of Ms. Schnabel and Mr. Grauer, this failure to provide the documentation Callahan had requested was false, deceptive, and misleading by omission and, upon information and belief, Credit Suisse had actual or constructive knowledge of this false and misleading omission.

53.     Callahan had made significant contributions to the PMD acquisition project and others who had made similar levels of contribution to that project had been recommended for inclusion, and actually were included, among the group of persons offered the opportunity to invest in the PMD Entity. The issue of Callahan's PMD status had been extensively discussed during the 2003 mediation and Credit Suisse never suggested during those discussions that Callahan had not been recommended for inclusion on the PMD List; to the contrary, Credit Suisse affirmatively agreed to provide Callahan with his status in the PMD. Credit Suisse had now, for many months, been making false and conflicting representations to Callahan and otherwise delaying in providing, and refusing to provide, Callahan with his status in the PMD, in an apparent bad faith effort to force Callahan to abandon his contractual rights. Finally, Credit Suisse's failure to provide the documentation Callahan had requested was false, deceptive, and misleading by omission and, upon information and belief, Credit Suisse had actual or constructive knowledge of this false and misleading omission.

*Callahan and Credit Suisse Enter into the 2009 Separation Agreement*

54.     Eventually, Callahan relented and, in a good faith effort to compromise in spite of Credit Suisse's dilatory and misleading tactics, Callahan advised Credit Suisse that he would not

press his contractual right to "his status in the PMD" if Credit Suisse would pay the

compensation agreed to in the Settlement Agreement. Specifically, faced with the upcoming six-

year anniversary of Credit Suisse's proffer of the 2003 Separation Proposal, Callahan's counsel

again wrote to Credit Suisse's attorney, Michael Carlinsky. By letter dated January 20, 2009,

Callahan's counsel advised Mr. Carlinsky that:

> Mr. Callahan has been struggling for all these years to attempt to
> get Credit Suisse to acknowledge his entitlement under the PMD as
> set forth in #4 of the Settlement Agreement. All his efforts have
> been futile. At this point he is abandoning any further efforts to
> get a response from Credit Suisse and wishes merely to conclude
> the settlement that was reached at the end of the mediation.
>
> It is the focus of this letter to ask that steps be taken to fund the
> settlement as called for pursuant to the mediation process, along
> with the separate benefits described in the Settlement Agreement.
> Will you please contact the undersigned at your convenience and
> advise what steps should be taken to bring this matter to
> conclusion.

55.     Upon information and belief, in an effort to avoid having Callahan file suit against

it, Credit Suisse now became responsive. Mr. Carlinsky referred Callahan's counsel to an in-

house lawyer for Credit Suisse, Brennan McDonough. Callahan's counsel had one or more

phone conversations with Mr. McDonough during which Callahan's counsel advised that

Callahan would abandon his long-standing request for documentation of his status in the PMD if

Credit Suisse would finally pay the compensation agreed to in the Settlement Agreement. Mr.

McDonough, on behalf of Credit Suisse, agreed and committed to send Callahan the "more

formal settlement agreement" to conclude the transaction.

56.     Mr. McDonough waited until April 7, 2009, a mere two days before the sixth

anniversary of Credit Suisse's proffer of the 2003 Separation Proposal, to send to Callahan a

separation agreement, signed by George C. Whipple III, Esq., for Callahan's counter-signature

(the "**2009 Separation Agreement**"). The 2009 Separation Agreement acknowledged Credit Suisse's obligation, "pursuant to the handwritten Settlement Agreement between [Callahan] and Credit Suisse, dated March 6, 2003," to make the $735,000 lump sum payment to Callahan. The 2009 Separation Agreement, in Exhibit A, once again acknowledged that Callahan's second and third tranches of his Retention Award, consisting of "6,984 shares" of Credit Suisse Group common stock, had vested as of December 31, 2001, "[p]ursuant to the terms of [Callahan's] Retention Agreement with DLJ dated September 27, 2000." Exhibit A of the 2009 Separation Agreement also confirmed that Callahan was fully vested in the DLJ Long Term Incentive Plan and his continuing rights under Credit Suisse's pension plan. Although sent only two days before the sixth anniversary of the 2003 Separation Proposal, the 2009 Settlement Agreement suggested that Callahan should take at least twenty-one (21) days to consider the 2009 Settlement Agreement and discuss it with his counsel.

57.     Shortly after receiving the signed 2009 Separation Agreement, Callahan advised Credit Suisse (by letter from his counsel to Mr. McDonough dated April 13, 2009) that he was in "full agreement" with its terms and requested confirmation of certain non-substantive matters, such as a typographical error in Exhibit A stating the initial value of Callahan's Retention Award (*i.e.*, at the time of issuance in 2000) as $5,000 instead of $500,000 (this error had no substantive meaning, because the Retention Award was defined by a *number* of shares, *i.e.*, "6,984 shares," not by the *value* of those shares at any given point in time).

58.     Callahan signed the 2009 Separation Agreement on or about April 15, 2009 and subsequently returned it to Credit Suisse, including a handwritten correction of the typographical error in Exhibit A (which, as stated, had no substantive effect).

59. Meanwhile, on or about May 21, 2009, after Callahan had advised Credit Suisse that he was in full agreement with the 2009 Separation Agreement but before it had received Callahan's countersignature on the 2009 Separation Agreement, Credit Suisse sent to Callahan a purported revision of the 2009 Separation Agreement, which inexplicably and contrary to the provisions of the Settlement Agreement, purported to eliminate Callahan's right to the remaining 6,984 shares of Credit Suisse Group common stock that had previously vested under the Retention Plan (the "**Attempted Revision**"). The purported justification for the Attempted Revision appears to have been that, at the time of Credit Suisse's termination of Callahan's employment without cause, Callahan had stated that he wished to publicly describe his departure from Credit Suisse as a retirement, so that he would not be publicly viewed as having been terminated, even though Credit Suisse's own documents, including the 2002 Separation Proposal, documents submitted in the 2003 mediation, the 2003 Separation Proposal, and the 2009 Separation Agreement itself, confirmed that Callahan had been terminated without cause within the meaning of the Retention Plan.

60. Callahan refused to accept the Attempted Revision and, instead, advised Credit Suisse that the 2009 Separation Agreement (which Callahan had previously accepted) constituted the "more formal settlement agreement and release" referred to in the Settlement Agreement.

61. Credit Suisse thereafter refused to pay to Callahan both the $735,000 and the 6,984 shares of Credit Suisse Group stock due to him under the Settlement Agreement and the 2009 Separation Agreement, claiming that Callahan had rejected the 2009 Separation Agreement by correcting the non-substantive typographical error in Exhibit A.

## FIRST CLAIM FOR RELIEF

### Breach of Contract
### *(The 2009 Separation Agreement)*

62.     Plaintiff repeats and restates the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

63.     The 2009 Separation Agreement is a valid and binding contract between Callahan and Credit Suisse, supported by valid consideration.

64.     Callahan has fully performed under the 2009 Separation Agreement.

65.     The 2009 Separation Agreement obligated Credit Suisse to pay to Callahan a lump-sum payment of $735,000, which Credit Suisse has failed and refused to pay, thereby breaching the 2009 Separation Agreement.

66.     The 2009 Separation Agreement obligated Credit Suisse to pay over to Callahan 6,984 shares of Credit Suisse Group common stock, which Credit Suisse has failed and refused to pay, thereby breaching the 2009 Separation Agreement.

67.     Credit Suisse's breaches of the 2009 Separation Agreement have caused Callahan to suffer damages in an amount to be determined at trial, but believed to be in excess of $1,100,000.

## SECOND CLAIM FOR RELIEF
### (in the alternative)

### Breach of Contract
### *(The 2003 Settlement Agreement)*

68.     Plaintiff repeats and restates the allegations contained in paragraphs 1 through 67 above as if fully set forth herein.

69.     The 2003 Settlement Agreement is a valid and binding contract between Callahan and Credit Suisse, supported by valid consideration.

70.     Callahan has fully performed under the 2003 Settlement Agreement.

71.     The 2003 Settlement Agreement obligated Credit Suisse to pay to Callahan a lump-sum payment of $735,000, which Credit Suisse has failed and refused to pay, thereby breaching the 2003 Settlement Agreement.

72.     The 2003 Settlement Agreement obligated Credit Suisse to pay over to Callahan 6,984 shares of Credit Suisse Group common stock, which Credit Suisse has failed and refused to pay, thereby breaching the 2003 Settlement Agreement.

73.     The 2003 Settlement Agreement obligated Credit Suisse to provide Callahan with his "status in the PMD," meaning that Credit Suisse would provide Callahan with information sufficient for Callahan to determine whether his name had been recommended for inclusion among the persons offered the opportunity to invest their own money into the PMD acquisition as equity investors.  Credit Suisse breached the 2003 Settlement Agreement through its continuous course of conduct, through at least June 11, 2004, in misrepresenting (both affirmatively and by omission) and otherwise delaying and failing to provide Callahan with information sufficient for Callahan to determine whether his name had been recommended for inclusion among the persons offered the opportunity to invest their own money into the PMD Entity as equity investors.

74.     Callahan's claims for breach of the 2003 Settlement Agreement did not accrue until after June 11, 2004, when it finally became clear that Credit Suisse would not provide to Callahan his status in the PMD.  Prior to that date, despite Callahan's diligent inquiries, Credit Suisse had obfuscated this issue and deceived and misled Callahan by giving him false,

misleading, contradictory and incomplete information about his status in the PMD. Prior to that date, Credit Suisse also misled Callahan by omission, by wrongfully and misleadingly failing to provide Callahan with documentation of his status in the PMD. In particular, at or around the time of the 2003 Separation Proposal in April 2003, Credit Suisse had affirmatively told Callahan that he had been recommended for inclusion among the persons offered the opportunity to invest in the PMD Entity, which Credit Suisse later claimed to be untrue.

75.    Upon information and belief, Credit Suisse had actual or constructive knowledge of the false and misleading nature of these misrepresentations and omissions at the time they were made. In the alternative, if Credit Suisse subsequently obtained such knowledge or constructive knowledge, it had a duty to correct its prior false and misleading statements and omissions by providing Callahan with truthful and accurate information, which Credit Suisse failed to do.

76.    To the extent that Callahan's claim for breach of the 2003 Settlement Agreement accrued on the date of Credit Suisse's proffer of the 2003 Separation Proposal, the statute of limitations applicable to that claim was tolled until at least June 11, 2004. Prior to that date, despite Callahan's diligent inquiries, Credit Suisse had deceived and misled Callahan by giving him false, misleading, contradictory, and incomplete information about his status in the PMD and also misled Callahan by omission by wrongfully and misleadingly failing to provide Callahan with documentation of his status in the PMD. Credit Suisse's misrepresentations (both affirmative and by omission) caused Callahan to refrain from taking legal action to enforce the 2003 Settlement Agreement through and including June 11, 2004.

77.    To the extent that Callahan's claim for breach of the 2003 Settlement Agreement accrued on the date of Credit Suisse's proffer of the 2003 Separation Proposal, Credit Suisse

should be equitably estopped from asserting the statute of limitations as a defense.  Having

received the January 20, 2009 offer by Callahan's counsel that Callahan waive the issue of his

PMD status, upon information and belief, Credit Suisse intended to induce Callahan into

refraining from filing suit to enforce the 2003 Settlement Agreement by proffering to him the

April 7, 2009 Settlement Agreement a mere two days before the expiration of that limitations

period, knowing and intending that it would seek to withdraw the 2009 Settlement Proposal once

that limitations period had expired.

  78. Credit Suisse's breaches of the Settlement Agreement have caused Callahan to

suffer damages in an amount to be determined at trial, but believed to be in excess of $1,100,000.

### THIRD CLAIM FOR RELIEF
**(in the alternative)**

**Breach of Contract**
*(The 2003 Settlement Agreement)*

  79. Plaintiff repeats and restates the allegations contained in paragraphs 1 through 78

above as if fully set forth herein.

  80. The 2003 Settlement Agreement is a valid and binding contract between Callahan

and Credit Suisse, supported by valid consideration.

  81. Callahan has fully performed under the 2003 Settlement Agreement.

  82. The Attempted Revision constituted a separate and independent breach of the

2003 Settlement Agreement because it purported to substantively change the binding provisions

of the 2003 Settlement Agreement to Callahan's detriment by eliminating Callahan's right to the

balance of his fully vested Retention Award.  This separate and independent breach did not occur

until May 2009.

83.    Credit Suisse's breach of the Settlement Agreement has caused Callahan to suffer damages in an amount to be determined at trial, but believed to be in excess of $1,100,000.

## FOURTH CLAIM FOR RELIEF
### (in the alternative)

### Breach of the Duty of Good Faith and Fair Dealing
*(The 2003 Settlement Agreement)*

84.    Plaintiff repeats and restates the allegations contained in paragraphs 1 through 83 above as if fully set forth herein.

85.    The 2003 Settlement Agreement is a valid and binding contract between Callahan and Credit Suisse, supported by valid consideration.

86.    Paragraph "(2)" of the 2003 Settlement Agreement provides: "This agreement is binding and the parties agree to execute a more formal settlement agreement and release, consistent with CSFB's standard settlement agreements[.]"

87.    Implicit in paragraph "(2)" of the 2003 Settlement Agreement is a duty of good faith and fair dealing, requiring the parties to, among other things, negotiate in good faith the "more formal settlement agreement and release" and to do so in a manner consistent with the business terms of the 2003 Settlement Agreement.

88.    Implicit in paragraph "#4" of the 2003 Settlement Agreement is a duty of good faith and fair dealing, requiring Credit Suisse to, among other things, provide truthful and timely information to Callahan about his "status in the PMD" and his post-employment benefits (such as his credited years of service for pension purposes).

89.    Credit Suisse breached its duty of good faith and fair dealing by misrepresenting (both affirmatively and by omission) Callahan's status in the PMD and by using dilatory tactics to drag the negotiation of the "more formal settlement agreement" out over a period of years,

including (for example) by failing to acknowledge Callahan's correct years of credited service for pension purposes until nearly a full year after the 2003 Settlement Agreement, all in an effort to circumvent its contractual obligations and disenfranchise Callahan.

90.     Callahan's claim for breach of the duty of good faith and fair dealing did not accrue until after June 11, 2004, when it finally became clear that Credit Suisse would not provide to Callahan his status in the PMD. Prior to that date, despite Callahan's diligent inquiries, Credit Suisse had obfuscated on this issue and deceived and misled Callahan by giving him false, misleading, contradictory and incomplete information about his status in the PMD. Prior to that date, Credit Suisse also misled Callahan by omission, by wrongfully and misleadingly failing to provide Callahan with documentation of his status in the PMD.

91.     To the extent that Callahan's claim for breach of the duty of good faith and fair dealing accrued on the date of Credit Suisse's proffer of the 2003 Separation Proposal, the statute of limitations applicable to that claim was tolled until at least June 11, 2004. Prior to that date, despite Callahan's diligent inquiries, Credit Suisse had deceived and misled Callahan by giving him false, misleading, contradictory, and incomplete information about his status in the PMD and also misled Callahan by omission by wrongfully and misleadingly failing to provide Callahan with documentation of his status in the PMD. Credit Suisse's misrepresentations (both affirmative and by omission) caused Callahan to refrain from taking legal action to enforce the 2003 Settlement Agreement through and including June 11, 2004.

92.     Upon information and belief, Credit Suisse had actual or constructive knowledge of the false and misleading nature of these misrepresentations and omissions at the time they were made. In the alternative, if Credit Suisse subsequently obtained such knowledge or constructive knowledge, it had a duty to correct its prior false and misleading statements and

omissions by providing Callahan with truthful and accurate information, which Credit Suisse failed to do.

93.     To the extent that Callahan's claim for breach of the 2003 Settlement Agreement accrued on the date of Credit Suisse's proffer of the 2003 Separation Proposal, Credit Suisse should be equitably estopped from asserting the statute of limitations as a defense.  Upon information and belief, Credit Suisse intended to induce Callahan into refraining from filing suit to enforce the 2003 Settlement Agreement by proffering to him the 2009 Settlement Agreement a mere two days before the expiration of that limitations period, knowing and intending that it would seek to withdraw the 2009 Settlement Proposal once that limitations period had expired.

94.     Credit Suisse's breaches of the duty of good faith and fair dealing have caused Callahan to suffer damages in an amount to be determined at trial, but believed to be in excess of $1,100,000.

## FIFTH CLAIM FOR RELIEF
### (in the alternative)

### Breach of the Duty of Good Faith and Fair Dealing
### *(The 2003 Settlement Agreement)*

95.     Plaintiff repeats and restates the allegations contained in paragraphs 1 through 94 above as if fully set forth herein.

96.     The 2003 Settlement Agreement is a valid and binding contract between Callahan and Credit Suisse, supported by valid consideration.

97.     Paragraph "(2)" of the 2003 Settlement Agreement provides: "This agreement is binding and the parties agree to execute a more formal settlement agreement and release, consistent with CSFB's standard settlement agreements[.]"

29

98.     Implicit in paragraph "(2)" of the 2003 Settlement Agreement is a duty of good

faith and fair dealing, requiring the parties to, among other things, negotiate in good faith the

"more formal settlement agreement and release" and to do so in a manner consistent with the

business terms of the 2003 Settlement Agreement.

99.     Credit Suisse breached its duty of good faith and fair dealing in May 2009 by

sending the Attempted Revision, which purported to substantively change the binding provisions

of the 2003 Settlement Agreement to Callahan's detriment by eliminating Callahan's right to the

balance of his fully vested Retention Award.  This separate and independent breach did not occur

until May 2009.

100.    Credit Suisse's breach of the duty of good faith and fair dealing has caused

Callahan to suffer damages in an amount to be determined at trial, but believed to be in excess of

$1,100,000.

### SIXTH CLAIM FOR RELIEF
#### (in the alternative)

**Breach of the Duty of Good Faith and Fair Dealing**
***(The 2009 Separation Agreement)***

101.    Plaintiff repeats and restates the allegations contained in paragraphs 1 through

100 above as if fully set forth herein.

102.    The 2009 Separation Agreement is a valid and binding contract between Callahan

and Credit Suisse, supported by valid consideration.

103.    Implicit in the 2009 Separation Agreement is a duty of good faith and fair dealing,

requiring the parties, among other things, to act in good faith and refrain from conduct intended

or having the effect of frustrating the spirit and purpose of the 2009 Separation Agreement and

depriving Callahan of the benefit of the bargain reached in the 2009 Separation Agreement.

104. Credit Suisse breached its duty of good faith and fair dealing by wrongfully and, upon information and belief, in bad faith attempting, in the Attempted Revision, to deprive Callahan of the fully vested Retention Award and by falsely claiming that Callahan's termination, for purposes of the Retention Plan, was the result of retirement rather than termination without cause.

105. Credit Suisse breached its duty of good faith and fair dealing by attempting, in the Attempted Revision, to wrongfully revoke and repudiate the 2009 Separation Agreement, in particular but without limitation, because having received the January 20, 2009 offer by Callahan's counsel that Callahan waive the issue of his PMD status, Credit Suisse, upon information and belief, proffered the 2009 Separation Agreement a mere two days before the sixth anniversary of the 2003 Separation Proposal, so that it could then attempt to revoke and repudiate the 2009 Separation Agreement after that sixth anniversary, thereby inducing Callahan not to take legal action long enough to give Credit Suisse the opportunity to assert a statute of limitations defense.

106. Credit Suisse's breach of the duty of good faith and fair dealing have caused Callahan to suffer damages in an amount to be determined at trial, but believed to be in excess of $1,100,000.

## SEVENTH CLAIM FOR RELIEF
### (in the alternative)

### Imposition of Constructive Trust
### *(The Retention Award)*

107. Plaintiff repeats and restates the allegations contained in paragraphs 1 through 106 above as if fully set forth herein.

31

108.    A fiduciary relationship existed between Callahan and Credit Suisse by virtue of Callahan's participation in the Retention Plan and Credit Suisse's pension plan, including without limitation pursuant to the Employee Retirement Income Security Act.

109.    A fiduciary relationship existed between Callahan and Credit Suisse by virtue of Callahan's status as an employee and Managing Director of Credit Suisse.

110.    A confidential relationship existed between Callahan and Credit Suisse by virtue of Callahan's status as an employee and Managing Director of Credit Suisse and by virtue of various confidentiality agreements between Callahan and Credit Suisse, including without limitation the confidentiality provisions of Credit Suisse's dispute resolution program, confidentiality provisions in documents governing Callahan's employment by Credit Suisse, the 2003 Settlement Agreement (which incorporated by reference the confidentiality provisions of the 2002 Separation Proposal), and the 2009 Separation Agreement.

111.    Credit Suisse promised Callahan that he was the owner of the 6,984 shares of Credit Suisse common stock because it had vested as a result of Callahan's termination without cause. This promise was made in the Retention Plan documents, in the 2002 Separation Proposal, orally during the mediation, in the 2003 Settlement Agreement, in the 2003 Separation Proposal, and in the 2009 Separation Agreement.

112.    In reliance on Credit Suisse's promise, Callahan allowed Credit Suisse to retain possession of the 6,984 shares of Credit Suisse common stock that had vested as a result of Callahan's termination without cause while the parties engaged in Credit Suisse's dispute resolution program and, thereafter, while the parties negotiated the formal settlement agreement that eventually culminated in the 2009 Separation Agreement.

113.   Credit Suisse has been unjustly enriched by its continued and wrongful retention of the 6,984 shares of Credit Suisse common stock that had vested as a result of Callahan's termination without cause.

114.   Callahan's claim for imposition of a constructive trust did not accrue until after June 11, 2004, when it finally became clear that Credit Suisse would not provide to Callahan his status in the PMD.  Prior to that date, despite Callahan's diligent inquiries, Credit Suisse had obfuscated on this issue and deceived and misled Callahan by giving him false, misleading, contradictory and incomplete information about his status in the PMD.  Prior to that date, Credit Suisse also misled Callahan by omission, by wrongfully and misleadingly failing to provide Callahan with documentation of his status in the PMD.

115.   To the extent that Callahan's claim for imposition of a constructive trust accrued on the date of Credit Suisse's proffer of the 2003 Separation Proposal, the statute of limitations applicable to that claim was tolled until at least June 11, 2004.  Prior to that date, despite Callahan's diligent inquiries, Credit Suisse had deceived and misled Callahan by giving him false, misleading, contradictory, and incomplete information about his status in the PMD and also misled Callahan by omission by wrongfully and misleadingly failing to provide Callahan with documentation of his status in the PMD.  Credit Suisse's misrepresentations (both affirmative and by omission) caused Callahan to refrain from taking legal action to enforce the 2003 Settlement Agreement through and including June 11, 2004.

116.   Upon information and belief, Credit Suisse had actual or constructive knowledge of the false and misleading nature of these misrepresentations and omissions at the time they were made.  In the alternative, if Credit Suisse subsequently obtained such knowledge or constructive knowledge, it had a duty to correct its prior false and misleading statements and

33

omissions by providing Callahan with truthful and accurate information, which Credit Suisse failed to do.

117. To the extent that Callahan's claim for imposition of a constructive trust accrued on the date of Credit Suisse's proffer of the 2003 Separation Proposal, Credit Suisse should be equitably estopped from asserting the statute of limitations as a defense. Upon information and belief, Credit Suisse intended to induce Callahan into refraining from filing suit to enforce the 2003 Settlement Agreement by proffering to him the 2009 Settlement Agreement a mere two days before the expiration of that limitations period, knowing and intending that it would seek to withdraw the 2009 Settlement Proposal once that limitations period had expired.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants awarding the following relief:

  a. On the First Claim for Relief, ordering Defendants to pay to Plaintiff damages in an amount to be determined at trial, but believed to be in excess of $1,100,000, plus interest at the statutory rate of 9% per annum and costs;

  b. On the Second Claim for Relief (in the alternative), ordering Defendants to pay to Plaintiff damages in an amount to be determined at trial, but believed to be in excess of $1,100,000, plus interest at the statutory rate of 9% per annum and costs;

  c. On the Third Claim for Relief (in the alternative), ordering Defendants to pay to Plaintiff damages in an amount to be

34

determined at trial, but believed to be in excess of $1,100,000, plus interest at the statutory rate of 9% per annum and costs;

d.  On the Fourth Claim for Relief (in the alternative), ordering Defendants to pay to Plaintiff damages in an amount to be determined at trial, but believed to be in excess of $1,100,000, plus interest at the statutory rate of 9% per annum and costs;

e.  On the Fifth Claim for Relief (in the alternative), ordering Defendants to pay to Plaintiff damages in an amount to be determined at trial, but believed to be in excess of $1,100,000, plus interest at the statutory rate of 9% per annum and costs;

f.  On the Sixth Claim for Relief (in the alternative), ordering Defendants to pay to Plaintiff damages in an amount to be determined at trial, but believed to be in excess of $1,100,000, plus interest at the statutory rate of 9% per annum and costs;

g.  On the Seventh Claim for Relief (in the alternative), ordering the imposition of a constructive trust with respect to the 6,984 shares of Credit Suisse common stock that had vested as a result of Callahan's termination without cause and ordering Credit Suisse to deliver to Callahan certificates evidencing ownership of those shares; and

h.  Ordering such other and further relief as the Court may deem just and proper.

Dated: September 29, 2011

ALL-Counsel P.C.
By: Andrew L. Lee (AL-3765)
680 Fifth Ave. Fl. 5
New York, NY 10019
(212) 541-2429
alee@ALL-Counsel.com
*Counsel for Plaintiff Patrick J. Callahan, Jr.*